THE NEW CENTRAL COAL COMPANY and ALEXANDER
    SHAW *vs.* THE GEORGE'S CREEK COAL and IRON
    COMPANY.

*Constitutional Law—Constitution of* 1867, *Art.* 3, *sec.* 48—*Con-
    stitutional interpretation—Eminent Domain—How Forfeiture
    against a Corporation enforced—Condemnation of Land for a
    Railroad—Jurisdiction in matters arising upon Proceedings
    for the .Condemnation of Land for a Railroad— When a Court
    of Equity will Enjoin a party seeking the Condemnation of
    land, from Entry thereon.*

By the Act of 1865, ch. 206, three persons therein named, and such others as
    might be associated with them in the manner therein provided, were incor-
    porated by the name of the Lincoln Coal, Iron, Fire Brick and Oil Com-
    pany, and were declared to "have all the privileges and rights necessary for
    carrying on the mining of coal and iron ores, and the manufacture of iron
    and fire brick, and for transporting to market the produce of their mines,
    land and manufactories, and should also have power to lease or purchase
    lands, mines and furnaces, with their appurtenances, and to hold all such
    property, personal, real and mixed, as they might require for the purposes
    aforesaid," &c.; and by the second section of the Act, for the purpose of
    enabling the company to transport the produce of their mines and manufac-
    tories to market, they were invested "with all and singular the rights,
    profits, powers, authorities, immunities and advantages for the surveying,
    locating and constructing a rail road, with the necessary appurtenances,
    from their mines or works to connect at any convenient point or points with
    other existing rail roads in Allegany County, or with the Chesapeake and Ohio
    Canal at Cumberland," in the same manner as had been given and dele-
    gated to the Baltimore and Ohio Rail Road Company, which included the full
    and ample power of condemnation for right of way. By the same section
    it was made the duty of the company to carry "all persons and property at
    the same rates of tolls and prices of transportation as the Baltimore & Ohio
    R. R. Company was, or should be by law, allowed to charge and receive."
    It was further provided by the fourth section of the Act, that until the first
    election of directors should be held, as therein provided, the three persons
    named in the first section as corporators, or a majority of them, should have

full power and authority to exercise all the corporate power of the company. There was no time limited for accepting the charter, or for organizing the corporation under it. The books for subscription to the capital stock were first opened on the 1st of September, 1871, and, upon subscriptions being taken, the stockholders on the same day, held a general meeting, and elected a president and directors of the company. By the Act of 1872, ch. 50, the name of the company was changed from their first corporate name, to that of the New Central Coal Company. Upon a bill filed against this company to have it restrained by injunction from prosecuting proceedings of condemnation of a right of way for a rail road through the lands of the complainant, the complainant contended that before the charter of the defendant was accepted by the corporators therein named, and before any rights had been acquired thereunder, the charter itself had become abrogated and annulled by force and effect of the 48th section of the 3rd Article of the Constitution of 1867. HELD:

That the Act of 1865, ch. 206, was a competent exercise of legislative power and discretion at the time of its passage; and conceding that it had not been accepted before the adoption of the Constitution of 1867, it was not repealed by the 48th section of the 3rd Article of said Constitution, which declares that corporations shall not be created by special Act, except in particular cases; and that any Act of incorporation passed in violation of such section shall be void; such provision being merely intended to prohibit future legislation of the character described, and not to repeal previous legislative Acts. And the Act of 1872, ch. 50, passed as an amendment to the Act of 1865, ch. 206, was a valid Act of the Legislature.

The rule of construction which requires that a statute shall be taken to have a prospective operation, and never a retrospective effect unless there is something on the face of the enactment putting it beyond doubt that the Legislature meant it to operate retrospectively, applies to the interpretation of the State Constitution.

By section 40, of Article 3, of the Constitution of the State, which declares that, "The General Assembly shall enact no law authorizing private property to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a jury, being first paid, or tendered to the party, entitled to such compensation," the Legislature is absolutely prohibited by implication from taking private property for any private use whatever, without the consent of the owner.

The Legislature in virtue of the right of eminent domain, may authorize the condemnation of private property by a mining company for the construction of a rail road to be used for the transportation of coal from its mines—such use being of a public nature.

New Central Coal Co., *et al.*, *vs.* George's Creek Coal & Iron Co.

The fact of the selling of the franchises of a mining company by the corporators, for a consideration, before any of the stock was subscribed for, by means of which alone corporate rights could be transferred, forms no ground for an injunction against the corporation to stay it in the exercise of its franchises. If there be a misuser or abuser of the franchises granted to a corporation, the State alone can take advantage of such acts, and that by a direct proceeding for the purpose. No cause of forfeiture can be taken advantage of, or enforced against a corporation, collaterally or incidentally, or in any other mode, than by direct proceeding, instituted by the State for that purpose.

Where there are two parties having adjoining lands, and one desires a right of way to a particular point, or to connect with a certain other way, he is not entitled by compulsory means to take the land of his neighbor for the construction of such road, if it can be made on his own land with anything like reasonable convenience for the accomplishment of the objects sought to be attained.

Where a party claims the right to condemn the land of his neighbor for the construction of a railroad, he must show at least a reasonable degree of necessity for the exercise of such right; and whether such necessity exists or not, is a question to be determined exclusively by the Court specially clothed with jurisdiction and power to pass on the propriety of the inquisition of condemnation.

Irregularities in taking the inquisition of condemnation, inadequacy of the damages assessed, and all such questions, can only arise and be decided by the tribunal to which the inquisition is required to be returned for ratification or rejection. A Court of Equity can properly exercise no jurisdiction over such questions.

When upon proceedings instituted to condemn land for a railroad, the inquisition is returned to the Circuit Court, and before any action is had thereon, the parties seeking the condemnation, enter upon the premises described in the inquisition, and commence to construct their road, such conduct is clearly unauthorized, and a Court of Equity will enjoin such unlawful entry until the final action of the Circuit Court on the inquisition, and the actual payment of the damages in the event of the ratification of the inquisition.

APPEAL from the Circuit Court for Allegany County, in Equity.

The opinion of the Court contains a sufficient statement of the case.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, ALVEY and ROBINSON, J.

*William Walsh,* for the appellant.

If the appellee's land was exempt from appropriation to public use—if the applicant had no power to condemn because its charter was void, or did not want the land for public use, or if for any other cause, the proceedings to condemn were erroneous or unfair, if the jury did not consider, value and allow all proper items of damage—all these matters were open before the Court of Law on the question of ratifying or rejecting the inquisition.

A Court of Equity has no power to interfere with the execution of the provisions of the appellant's charter. The proceedings to condemn were *in fieri*, and all objections were available before the Court of Law. Under the charter the Court of Law is a special jurisdiction having exclusive authority to set aside, confirm or order a new inquisition. Equity could only interfere *after confirmation* for some want or abuse of power. *Wilm. & Susq. R. R. Co. vs. Condon,* 8 *Gill & J.,* 443; *Balto. & Havre de Grace Turnpike Co. vs. North Central R. R. Co.,* 15 *Md.,* 193; *Hamilton vs. Annapolis and Elk Ridge R. R. Co.,* 1 *Md.,* 553, 569; *Balto. and Havre de Grace Turnpike Co. vs. Union Railway Co.,* 35 *Md.,* 221; *Stevens vs. Middlesex Canal,* 12 *Mass.,* 466; *Stowell vs. Flagg,* 11 *Mass.,* 364; *Calking vs. Baldwin,* 4 *Wend.,* 667; *Kerr on Injunctions, sec.* 342; *Western Maryland R. R. Co. vs. Patterson, ante,* 125.

If the appellant's charter was a valid law of the State they had a right to exercise the franchise granted by it, and the Court could not rightfully restrain them. The Constitution of 1867 did not purpose to repeal private Acts of Assembly. Its object was to prescribe the boundaries of future legislation, and not to annul private grants of past Legislatures. The 48th section of the 3d Article

expressly confirms such previous grants by reserving to the Legislature the power to alter and amend them, where such power was reserved in the original Acts.   The charter of the appellants passed in 1865, cannot be "an Act of incorporation passed in violation of this (the 48th) section."

All Constitutions and laws speak to the future and not to the past.   General legislation does not repeal or alter prior special legislation.   *Cooley on Const. Limitations*, 62, 370 ; *Trustees of the Birkenhead Dock vs. Laird, &c.*, 4 *De G. M. & G.*, 732 ; *Fitzgerald vs. Champneys*, 2 *John. & Hem.*, 31.

The appellant's charter was accepted by the corporators as soon as it was granted.   The grant was solicited by the corporators, and needed no special acceptance to be shown by proof, because acceptance is presumed.   But acceptance is proved also.   *Ellis vs. Marshall*, 2 *Mass.*, 269 ; *Middlesex Husbandmen and Manufacturers vs. Davis*, 3 *Metcalf*, 133 ; *Newton vs. Carberry*, 5 *Cranch C. Ct.*, 632 ; *Angell and Ames on Corp.*, sec. 83.

The terms of the appellant's charter are the same as the Frostburg Coal Company's, (Act of 1844, ch. 135,) which was held to create the corporators, a body corporate at once, and to authorize them to exercise all the franchises of the company without any previous acts done on their part.   *Lessee of Frost, et al. vs. The Frostburg Coal Co.*, 24 *How.*, 278 ; *Penobscot Boom Corpo. vs. Lamson*, 16 *Maine*, 224.

The Act of 1872, ch. 50, amending the appellant's charter and enlarging its powers, is a legislative declaration of the non-repeal of the charter, and would be sufficient to cure all defects of organization, if any existed. *Franklin Fire Insurance Co. vs. Hart.*, 31 *Md.*, 59 ; *Basshor vs. Dressel*, 34 *Md.*, 503.

The appellant's charter gives it all the rights and powers for surveying, locating and making its proposed

railroad, which the charter of the Baltimore and Ohio Railroad Company gave it for the same purposes, in regard to its railroad. The appellant had a right, therefore, to enter upon the land, *after the view*, and pending the confirmation of the inquisition, for all purposes preliminary to the acquisition of the title to the land required. The bill on its face shows the entry was *after view*, and shows the pendency of the confirmation. All that is charged was of that preliminary character allowed by the charter and by general law applicable to this class of cases. It was not an entry under claim of consummated title in the appellant under its charter. If not lawful as an incipient step to the acquisition of the title, it was a mere trespass, not remediable by injunction. There is a broad and clear distinction between such preliminary acts, and that kind of "taking" of the land, which is prohibited by the Constitution, and in some cases restrained by injunction, until compensation is paid or tendered. *There is no right to compensation until confirmation—no right to compensation while the party to receive it is resisting confirmation.* Therefore, the injunction cannot rest on the ground of the "taking" of the land without compensation paid. The "taking" of the land prohibited by the Constitution, without previous compensation, is the permanent, physical occupation and appropriation of the land after confirmation; and not entries, surveys, examinations or acts with a view to test fitness of location, or, originate or continue proceedings to acquire the permanent use and title of the land.

As regards such preliminary acts, they are either lawful under the 17th section of B. & O. R. R. charter, (which section is part of the appellant's charter,) or they are lawful as incident to the exercise of the right of ultimately taking the land, or mere naked trespasses, not remediable by injunction, but are in no sense the very "taking" of the land meant and prohibited by the Constitution. *Winslow*

New Central Coal Co., *et al.*, *vs.* George's Creek Coal & Iron Co.

*vs. Gifford*, 6 *Cush* , 327 ; *Cushman vs. Smith*, 34 *Maine*, 247 ; *Steuart vs. Mayor, &c., of Baltimore, et al.*, 7 *Md.*, 501.

The appellee's lands are subject to the right of eminent domain to the same extent as if they belonged to a private citizen  Even the franchises of a corporation may be taken for public use, and *a fortiori* may its lands be so taken.  *The Bellona Co.'s Case*, 3 *Bland*, 442 ; *The West River Bridge Company vs. Dix, et al.*, 6 *How.*, 507 ; *Perrine vs. Chesapeake and Delaware Canal Company*, 9 *How.*, 72 ; *Richmond, &c., R. R. Co. vs. Louisa R. R. Co.*, 13 *How.*, 71 ; *The Binghampton Bridge*, 3 *Wallace*, 51.

The use for which the appellant requires the land is a public use in the Constitutional sense.  The railroads of the appellee, the Cumberland Coal and Iron Company and Mt. Savage Company, were all made by private mining corporations to carry the produce of their mines to market under legislative grants similar to the appellant's. Condemnations were made for them and confirmed by the Courts, and acquiesced in by the profession and the people.  It is too late for the appellee to raise the question now.  It is certainly a matter of great and general public interest to obtain access to the coal fields of the State, and to furnish the markets with coal for forges, ships, railroads and domestic purposes, though such coal may be owned by a single person or corporation.  Domestic comfort, travel, commerce, and almost every branch of industry, requires coal.  The law does not look to whether one person or a thousand owns the coal, but to the universal public necessity of obtaining it.  The law regards the question, not from the side of the owner or producer, but from the side of the great body of the public, who are the consumers.  It is entirely overlooking the broad reasons that underlie the right of eminent domain to limit its exercise from the standpoint of the appellee's contention.  The Legislature has always taken a different view

of it, and the Court will not go behind the Legislative judgment of what public needs require. *Gwynn vs. Jones' Lessee,* 2 *G. & J.,* 173, *Reddall vs. Bryan,* 14 *Md.,* 444; *Spring vs. Russell,* 7 *Green,* 273; *Harvey vs. Thomas,* 10 *Watts,* 65; *Hazen vs. Essex Co.,* 12 *Cush.,* 477; *The People vs. Smith,* 21 *N. Y.,* 597; *Beekman vs. Saratoga, &c., R. R. Co.,* 3 *Paige,* 73; *Hartwell vs. Armstrong,* 19 *Barb.,* 166.

The appellant's railroad is located to connect with the railroad built by the appellee. The latter's charter granted to all citizens and corporations the right of connecting with its railroad by railroads to be made by them. What equity has the appellee to deny the appellant this right? It might be reasonably contended that the appellant would have a right to lay a road free over the appellee's land to make this connection. The appellee accepted its charter and made its road *cum onere.* Outside of the appellant's charter, there must be some mode of enforcing the right of access to the appellee's railroad. *Bell vs. The Midland Railway Co.,* 10 *C. B. N. S.,* 287, (100 *E. C. L. R.*;) *The Midland Railway Co. vs. The Ambergate, &c., Railway Co.,* 10 *Hare,* 359; *Bishop vs. North,* 11 *Mees. & Wels.,* 418.

But even if it were right to grant the injunction, the answer having denied all the substantial grounds of the bill, the Court should have dissolved it. At least the injunction should have been so modified as to permit the appellant to obtain an order from the Court of Law for a new inquisition, and to take all necessary proceedings to obtain the right of way. As the injunction now stands, the appellant can take no steps whatever to obtain this right of way and make the proposed railroad. The injunction, if allowable on any ground alleged in the bill, should have been granted, or continued in a much narrower extent, and only *until the appellant had agreed with the appellee, or consummated its title to the right of way according*

*to the provisions of its charter.* But the injunction is unlimited in duration, and so comprehensive in character as to prevent the appellant from taking any steps under its charter to secure the right of way.

*Julian I. Alexander,* for the appellee.

The act of incorporation of the appellant is null and void under the Constitutions of 1864 and 1867.

The Constitution of 1864, in its 3d Article, sec. 32, provides that "the General Assembly shall pass no special law for any case for which provision has been made by an existing general law. The General Assembly, at its first session after the adoption of this Constitution shall pass general laws providing for the cases enumerated in this section, and for all other cases where a general law can be made applicable." And by section 51 of the same Article it is provided that "corporations may be formed under general laws, but shall not be created by special Act except for municipal purposes, and in cases where, in the judgment of the General Assembly, the object of the corporation cannot be attained under general laws."

The prohibition of section 32 is express that no special law shall be passed for any case for which provision has been made by an existing general law, and general laws are to be passed providing for the cases enumerated in the section, and all other cases where a general law can be made applicable. It is true that section 51 provides for the special case of corporations, but it is not the less true that the two sections are to be read together; reading "may" in the 51st section as "must," and this ought to be done where public interests or rights are concerned, and public or third persons have a right that the power shall be exercised; (*Blake's Case,* 39 *N. H.*, 435;) the section then has direct reference to the 32d section. If, then, the object of the corporation can be attained under general laws, and it is to be noted that the word is in the

35                         v. 37.

plural, and a corporation may legitimately avail itself of several general laws, a special Act is void, and it is rather to be presumed that the Legislature is deceived in its grant where it is not affirmatively shown that its judgment was exercised, and it is manifest that the object of the corporation could be attained under general laws, than to presume that the Legislature deliberately set at nought, for a private purpose, this imperative constitutional restriction. At the time this charter was passed there was both an existing law, and all the objects of the corporation could have been attained under it. The Code, Article 26, sections 68 to 87, incorporating sections 40 to 67, was the existing law.

The act of incorporation of the appellant is also void under the Constitution of 1867. The argument is briefly this: A charter, to be valid, must be accepted; until acceptance, it is a mere offer on the part of the Legislature, and the offer may be withdrawn at any time by the Legislature, and especially here, where the power of repeal or alteration was reserved. *A fortiori* it may be withdrawn by the sovereign people. The Constitution of 1867 did operate to withdraw the offer; consequently, any subsequent action under the charter was a nullity.

What is acceptance? In *Rex vs. Hughes*, 7 *B. & C.*, 708, it was agreed that any unequivocal *act*, showing a desire and intention to accept the charter, is enough, provided it is done by a majority of the grantees. The language of the Court of Appeals in the *Canal Co. vs. Railroad Co.*, 4 *G. & J.*, 145, clearly looks to some *act done* or *right acquired* as necessary to acceptance. Acceptance may be proved by showing the exercise of corporate powers; that is to say, formal proof of express acceptance by the only manner in which a corporation can regularly act may be dispensed with, and acceptance may be implied, as in the case of other contracts, not from the secret intentions or privy communications of the corporators *inter sese*,

but from the open corporate acts of the parties. *Shortz vs. Unangst*, 3 *Watts & S.*, 45; *Pingrey vs. Washburn, Treasurer, &c.*, 1 *Aiken*, 264; *Newton vs. Carberry*, 5 *Cranch C. C.*, 632; *Bank of U. S. vs. Dandridge*, 12 *Wheat.*, 71.

It is admitted that in this case there was and is no written instrument or vote of acceptance on the corporation books. Where are the facts, which, in the language of the Supreme Court, *demonstrate* that the charter must have been accepted? or, in the language of our Court of Appeals, what *act was done* or *right acquired* under the charter? The answer, indeed, does not say that the charter was accepted; but to show conclusively that it was not accepted, the answer goes on to say that the corporators were watchful to organize whenever an opportunity should present itself, &c. They accepted, upon their own showing, only on a contingent. But the appellee is not bound by the answer; and the evidence clearly shows that there was no acceptance.

The corporators, although the charter was passed in 1865, *did nothing* with it at all until about the first of September, 1871, when they sold it, with all its abundant powers and privileges, to George A. Pearre, for $300. A witness of the appellant testified that nothing was done prior to the sale of the franchises to George A. Pearre. It is true, the Company was shortly thereafter organized under the direction of their vendee. But nothing was done by the corporators under the charter for more than five years after its passage. It is clear that before acceptance a charter may be withdrawn. This charter reserves the right to the Legislature to alter and repeal it at pleasure. But this Court has said of "the common case of an act of incorporation passed by an individual State," that "ordinarily the State may repeal or modify" it "at pleasure at any time before it is accepted, and when no rights are acquired under it. * * * Because, until accepted

it is not a grant, and there is no contract between the State and the corporation—no pledge of public faith to be violated by any alteration of the charter.'' *Canal Co. vs. Railroad Co.*, 4 *G. & J.*, 145, 198.

Then is an alteration in the Constitution of the State prohibiting such incorporations before acceptance of such an offer, a withdrawal of it? To show that it is, reference may be had to *Gillespie vs. Fort Wayne & S. R. R.*, 17 *Ind.*, 243; *State vs. Dawson*, 16 *Ind.*, 40; *Harriman vs. Southam*, 16 *Ind.*, 190; *Aspinwall vs. Commrs. of the County of Daviess*, 22 *How.*, 364; *Ex parte Pritz,* 9 *Iowa*, 30; *Davis vs. Woolnough*, 9 *Iowa*, 104; *Oliver Lee & Co's Bank*, 21 *N. Y.*, (7 *Smith*) 9.

The 48th section of Article 3 of the Constitution of 1867, provides that `` Corporations may be formed under general laws, but *shall not be created by special Act*, except for municipal purposes, and except in cases where no general laws exist providing for the creation of corporatians of the same general character as the corporation proposed to be created; and any Act of incorporation passed in violation of this section shall be void.'' The 5th Article of the Bill of Rights continues all Acts of Assembly in force on the 1st day of June, 1867, except such as may since have expired, or *may be inconsistent with the provisions of this Constitution.*

The grant of the charter to the appellant was but an offer; it required acceptance; and till acceptance could be withdrawn by the State. And not having been accepted in the meanwhile, it was withdrawn by the adoption of the Constitution of 1867, which provided that corporations should not be created by special Act, except for municipal purposes, &c.

Further, the charter is void because it is not constituted of any particular place. *Sutton's Hospital*, 10 *Rep.*, 29*b*, 32*b*; *Rolle's Abr. Corp.*, (*D.*;) *London Tobacco Pipe Co. vs. Woodroffe*, 7 *B. & C.*, 838.

The corporators had no power to sell their franchise. But if they did validly part with their interests in it, their continuance as corporators was a mere sham, and the organization of the Company a part of the corrupt bargain. The Bill of Rights denounces monopolies and the grant of exclusive privileges, but what is the grant by the Legislature of the power of eminent domain for sale by the grantee, but a grant of an exclusive privilege tending to a monopoly? *Commonwealth vs. McKean Co. Bank*, 32 *Penna.*, 185 ; *The Regent's Case*, 9 *G. & J*, 365, 399.

The transfer of franchises by a company was expressly decided to be void in *Susquehanna Canal Co. vs. Bonham*, 9 *Watts & S.*, 27 ; *Arthur vs. Commercial, &c., Bank*, 9 *Sm. & M.*, 394 ; *Clark vs. Corporation of Washington*, 12 *Wheat.*, 40.

The proposed railway is not such a public use as justifies the exercise of the power of eminent domain.

From 2 *Kent's Comm.*, 340, it appears that the constitutional limitations which are found in our Constitution, Article 3, section 40, prevent, 1st, the taking of private property for any private use whatever ; and, 2d, for any other than a public use, on compensation being made ; 3d, that whether the power is to be exercised is a question for the Legislature ; but, 4th, what is such a public use as will justify the exercise of the power of eminent domain, is a question for the Courts.

One of the earlier cases is *Bonaparte vs. Camden & Amboy R. R.*, 1 *Baldw. U. C.*, 205. There, after citing a number of cases, to show that an injunction would issue to prevent trespasses by a party acting under color of law, the Court observed that it was conceded that the law was void if it was to effect a private object, and that the true criterion was whether the objects, uses and purposes are for public convenience or private emolument. After holding that the C. & A Co. was a private corporation, the learned Judge went into the inquiry whether the use

was public, and though it seemed to him like a monopoly, yet in a case of doubt he would not hold the charter unconstitutional, and he decided that the law compels the owner, in such a case, to alienate for a reasonable compensation, but does not allow the Company to take the land for any sum it can get a jury to say it is worth. See *The West River Bridge Co. vs. Dix, et al.*, 6 *How*, 507, 539, 545, 546, 547; *Cooley on Constl. Lim.*, 531; *Gilmer vs. Lime Point*, 18 *Cal.*, 229; *Dawson vs. Paver*, 5 *Hare*, 415; *Nesbitt vs. Trumbo*, 39 *Ill.*, 110; *Crean vs. Crossly*, 40 *Ill.*, 175; *Bankhead vs. Brown*, 25 *Iowa*, 540; *Lance's Appeal*, 55 *Penn.*, 25; *Stewart's Appeal*, 56 *Penn.*, 413; *Warren & Franklin R. R. Co vs. Clarion Land Co.*, 54 *Penn.*, 28; *The King vs. Ward*, 4 *A. & El.*, 384; *Dunham vs. Williams*, 36 *Barb.*, 136; *Memphis Freight Co. vs. Memphis*, 4 *Coldwell*, 419; *Binney's Case*, 2 *Bland*, 129, 135; *Hepburn's Case*, 3 *Bland*, 98; *The Bellona Company's Case*, 3 *Bland*, 450; *State, &c., vs. Graves, et al.*, 19 *Md.*, 351.

Looking at the Act, it will be seen that the Legislature does not declare the use under the charter a public use. On the contrary, the Act declares that for the purpose of enabling said Company to transport the produce of their mines and manufactories to market, "the said corporation is invested with the power to condemn," &c. In what plainer words could a private use be declared? One of the obvious tests of a public use is that the object of the use, when secured, cannot help in the nature of things being enjoyed by the public. But here is a private enterprise, to whose complete enjoyment, according to the very terms of the Act authorizing it, the intervention of the public is by no means necessary, for how can the public share in the transportation of the Company's produce? The assistance of the grant of eminent domain is invoked to show that the use is public, and then the assumption that the use is public is employed to justify the grant of

eminent domain.   But a public use must be public *per se.*
The main purpose here is declared to be private.   And if
it be true, as it certainly is, that the power of eminent
domain cannot be granted to further a private use under
color of a public use, what more apt instance of the abuse
of public power could be given than this very case?   The
Company would, irrespective of its charter, certainly have
a right if it could purchase it to come out with its produce
by a tramroad over the appellee's land to the C. and P.
R. R.   If the road was built it would certainly have the
right for the convenience of those dealing with it to act
as a common carrier, and, if it declared itself such, it
would be bound as a common carrier to carry for a rea-
sonable price.   All the objects of the Act could, therefore,
be obtained without a grant of the power of eminent
domain.   But if this be not so, still the Legislature might
have granted the liberty of becoming common carriers
without the power of eminent domain, and so the charter
ought to be construed.   Every object of the appellant can
be attained, if it will only pay for it, without the exercise
of the power of eminent domain ; and, what is directly to
the purpose, without constituting its road a public use.
Upon the very language of the Act, it appears that the
Legislature were not contemplating, or might not have
been contemplating, a public use at all, and that the
power of eminent domain has been granted to subserve a
plainly private use.

The powers of condemnation have not been exercised in
time.   The Act incorporates the charter of the B. and O.
R. R. Co.   By the 22d section of that Act, the road was
required to be commenced within two years.   And where
is the unreasonableness of holding that this was a sub-
stantial condition to be complied with by the appellant?
In England it is most usual to limit the term within
which compulsory powers to take land may be exercised.
Now, it has been frequently held that the power to take

the lands of private persons is determined by the expiration of the time limited for its exercise. *Morris and Essex R. R. vs. Central R. R.*, 2 *Vroom* (*N. J.*) 205 ; *Reg. vs. London and N. W. Railway Co.*, 6 *Eng. L. & Eq.*, 220 ; *Peavey vs. Calais Co.*, 1 *Am. Railway Cases*, 147 ; *Plank Road Co. vs. Davidson*, 39 *Penn.*, 435 ; *Pratt vs. Atl. and St. Lawrence R. R. Co.*, 42 *Maine*, 579 ; *Thicknesse vs. Lancaster Canal Co.*, 4 *Mees. & W.*, 472.

The appellant has no right to interfere with the appellee's reasonable working of its mines by occupying its only means of outlet. It is *not necessary* for the Lincoln Company to come over this part of the appellee's property, and therefore, one of the elements requisite to the exercise of the power of eminent domain does not exist, to wit: its public necessity. The inconvenience to the appellee from the proposed road would be most excessive, and the appellant can get out at the other end of its property on Squirrel Neck Run. A witness who is an expert, proves that that would be the best course for the appellant, for though the expense would be heavy at first it would be paid back in the saving of freight. It was open to the appellant to contradict this, but it never attempted to do so.

The charter of the appellee gives it the right of mining its coal as economically and conveniently as it can, and gives it the right of being carriers of its own coal on its own land. And the appellant stands, as to powers and rights, on no higher grade than the appellee. Hence, in the absence of a clear and express grant of such a right as claimed by the appellant, it will not be implied that the Legislature intended to interfere with the previously granted franchises or vested rights of the appellee. *Canal Co. vs. Railroad Co.*, 4 *G. & J.*, 1 ; *Mayor of Jersey City vs. Morris Canal and Banking Co.*, 1 *Beasley*, 547 ; *McRoberts vs. Washburne*, 10 *Minn.*, 23 ; *Morris & Essex R. R. Co vs Central R. R. Co.*, 3 *Vroom*, 214 ; *Manchester, &c.*,

*Railway Co. vs. Great Northern Railway Co.*, 9 *Hare*, 284; *Jenkin's 5th Century, Case XI.*

ALVEY, J., delivered the opinion of the Court.

The bill in this case was filed by the appellees to have the appellants restrained by injunction, from prosecuting proceedings of condemnation of a right of way for a railroad, through the lands of the appellees. The inquisition had been taken and returned into Court for ratification, before the bill was filed; and by the injunction that was granted, the appellants were restrained "from doing or causing or permitting to be done, any act, matter or thing, in or towards, or for the purpose of obtaining possession of any part of the lands of said company, and from, in any way, entering thereon, or on any part thereof, or in any way interfering with said company's possession of said lands, and the said company's free and uninterrupted use thereof," until the further order of the Court.

After the granting of this injunction the inquisition that had been returned to the Circuit Court for Allegany County was set aside for cause shewn; and, upon motion to dissolve the injunction, the Judges in the Court below being divided in opinion, the motion was overruled; and it is from the order overruling the motion to dissolve, in consequence of the division in opinion of the Judges, that this appeal is taken.

There are several questions presented by the record, some of which are of considerable interest and importance; and, without unnecessary detail of fact, we shall take them up and consider them in their order.

1. The first among the questions seriously urged is, whether the appellants ever acquired corporate franchises from the State to enable them to do what they attempted to do, and which was restrained by the injunction?

The appellants were chartered by the Act of 1865, chapter 206, by the name of the Lincoln Coal, Iron, Fire-

Brick, and Oil Company, of Allegany County. By the Act, it was declared that the three persons therein named, and such other persons as might be associated with them in the manner therein provided, should be and were thereby incorporated and made a body politic by the name and style of, &c., "and the said company shall have all the privileges and rights necessary for carrying on the mining of coal and ores, and the manufacture of iron and fire-brick, and for transporting to market the produce of their mines, land, and manufactories, and shall also have power to lease or purchase lands, mines, and furnaces, with their appurtenances, and to hold all such property, personal, real and mixed, as they may require for the purposes aforesaid," &c., and by the second section of the Act for the purpose of enabling the Company to transport the produce of their mines and manufactories to market, they are invested "with all and singular the rights, profits, powers, authorities, immunities and advantages for the surveying, locating and constructing a railroad, with the necessary appurtenances, from their mines or works to connect at any convenient point or points with other existing railroads in Allegany County, or with the Chesapeake and Ohio Canal, at Cumberland," in the same manner as have been given and delegated to the Baltimore and Ohio Railroad Company, which includes the full and ample power of condemnation for right of way. By the same section, it is made the duty of the appellants to carry "all persons and property at the same rates of tolls and prices of transportation as the Baltimore and Ohio Railroad Company are, or shall be by law, allowed to charge and receive." It is further provided, by the fourth section of the Act, that until the first election of directors should be held, as therein provided, the three persons named in the first section as corporators, or a majority of them, should have full power and authority to exercise all the corporate power of the Company.

There is no time limited for accepting the charter, or for organizing the corporation under it.

The books for subscription to the capital stock were first opened on the 1st of September, 1871, and, upon subscriptions being taken, the stockholders, on the same day, held a general meeting, and elected president and directors of the Company.

Afterwards, by the Act of 1872, chapter 50, the name of the appellants was changed from their first corporate name to that of the "New Central Coal Company," and it is by the latter name that the appellants have answered the bill in this case.   The Act authorizing the change of name also authorized an increase of capital stock from two and a half millions to five millions of dollars, and also provided for an additional number of directors to manage the affairs of the corporation.

The Act of incorporation in this case is almost identical in its provisions with that of the Frostburg Coal Company, also a Maryland Act of Incorporation, which came under consideration of the Supreme Court of the United States, in the case of *Frost's Lessee vs. Frostburg Coal Co.*, 24 *How.*, 278.   In that case, in reference to the question of the corporate existence, the Court held that the persons named in the Act of incorporation constituted the corporate body, and were clothed with all the powers and privileges conferred by the charter, and that the latter took effect immediately on its acceptance by the persons named in the Act; and the subsequent steps, such as the subscription of the stock, procurement of the coal lands, election of the directors, of the president and secretary, passing by-laws, &c., were steps taken in perfecting the organization, and to enable it to use its powers and privileges for the purpose for which they were granted.   The principle of this case in 24 *Howard* is unquestionably correct, and, as such, has been recognised by this Court, in the case of the *Franklin Fire Ins. Co. vs. Hart*, 31 *Md.*, 59.

In this case, however, it is alleged and contended, that before the charter was accepted by the corporators therein named, and before any rights had been acquired thereunder, the charter itself had become abrogated and annulled by force and effect of the 48th section of the 3rd Article of the Constitution, adopted in 1867.

What is sufficient evidence of acceptance of the charter by the corporators, is often a question depending upon the circumstances under which the charter itself was procured. It is not necessary that the Act of acceptance be evidenced by writing, nor even by the vote of the corporators. Acceptance of the charter may generally be inferred from the exercise of the corporate powers granted. "If a peculiar charter is applied for, and it is given, there can be no reasonable ground to doubt of its immediate acceptance. It has, indeed, been held that grants beneficial to corporations, may be presumed to have been accepted, and an express acceptance is not necessary." *Ang. & Am. on Corp.*, sec. 83; *Charles River Bridge vs. Warren Bridge,* 7 *Pick. Rep.*, 344. Here, there is express proof by one of the corporators, that the Act of incorporation was immediately accepted, though nothing appears to have been done under it until September, 1871.

But, apart from the question whether the charter had been accepted before the adoption of the Constitution of 1867, and conceding that it had not been, does the provision of the Constitution relied on by the appellees, apply to or affect this charter in the manner supposed?

The Constitution, by the 48th section of the 3rd Article, provides, that "corporations may be formed under general laws; but shall not be created by special Act, except for municipal purposes, and except in cases, where no general laws exist, providing for the creation of corporations of the same general character, as the corporation proposed to be created; and any Act of incorporation, *passed* in violation of this section shall be void;" and, by

the last clause of the same section, it is provided, that "all charters heretofore granted, subject to repeal or modification, may be altered, from time to time, or be repealed." The Act of incorporation now before us was, as we have before stated, passed before the adoption of this constitutional provision, and at the time of its passage there was in existence a general law, which still exists, with some modifications, providing for the creation of corporations of the same general character, as that created by the special Act. This special Act was a competent exercise of legislative power and discretion at the time of its passage, and unless the present Constitution was intended to have a retrospective operation and to embrace prior acts of legislation as well as the future, there can be no question as to the validity of the appellants' charter.

The general rule for the construction of statutes is plain and well settled, and is founded in the most obvious principles of justice, and that is, that the law shall be taken to have a prospective operation, and never a retrospective effect, unless there is something on the face of the enactment putting it beyond doubt that the Legislature meant it to operate retrospectively. *Moon vs. Durden*, 2 *Exch.*, 22. There can be no good reason suggested why this same general principle, so wise and just, should not also apply as a rule of interpretation of the Constitution. It is stated as the rule upon the subject, by Judge COOLEY, (*Const. Lim.*, 62,) and he is not only supported by the reason and justice of the thing, but by authority. In the case of *Cass vs. Dillon*, 2 *Ohio, N. S.*, 607, a question arose as to the effect of a clause in the State Constitution, which declared that the Legislature "shall never authorize any county, town, or township, by vote of its citizens or otherwize, to become a stockholder in any joint stock company, corporation, or association," and it was held that a law enacted before the adoption of the Constitution, authorizing such subscription, was not repealed by

implication, as the clause in the Constitution referred only to future laws.   Other cases might be cited, if it were necessary, illustrative of the same general proposition.   The principle, however, is too well founded in reason and justice to require the support of authority.

With this rule of construction in view, the terms of the constitutional provision relied on here, would seem to admit of no doubt.   When it is declared that corporations shall not be created by special Act, except in particular cases, it is manifestly intended to create prohibition to future legislation of the character described, and not to repeal previous legislative Acts.   And so, when it is declared that any Act of incorporation, *passed* in violation of the particular section of the Constitution, shall be void, it would seem to be plain, from the ordinary grammatical sense of the terms, that they refer to future Acts of the Legislature; as it is not easy to conceive how a previous Act could have been *passed* in violation of this particular constitutional provision, which at the time had no existence.   And it is not less clear, we think, that the Act of 1872, chapter 50, passed as an amendment of the appellants' charter, is also a valid Act of the Legislature. The power is expressly reserved to the Legislature, by the section of the Constitution already referred to, to alter or repeal all previous charters; and as the amendment here obtained was but an alteration, it was clearly competent to the Legislature to make it.

In the course of the argument for the appellees several cases were referred to as authorities for the position that the Constitution operated a repeal of the previous Act of incorporation; but, in reference to those cases, it is sufficient to say that in none of them, except those in 16 *Ind. Rep.*, 40, and 17 *Ind. Rep.*, 243, were the questions decided at all analogous to that presented here; and as to the cases in the Indiana Reports, they would seem to be based upon a course of reasoning that we could not apply

to this case. Besides, the language employed in the clause of the Indiana Constitution, with reference to which those cases were decided, is not the same as that in our Constitution.

2. The next question presented is, whether the use for which the appellees' land is attempted to be condemned and appropriated by the appellants, is such a public use as is authorized by the 40th section of the 3d Article of the Constitution?

The section of the Constitution just referred to declares that "The General Assembly shall enact no law authorizing private property to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a jury, *being first paid*, or tendered to the party entitled to such compensation."

By the plain and well acknowledged construction of this constitutional provision, which is found in nearly if not all American Constitutions, the Legislature is absolutely prohibited by implication from taking private property for any private use whatever, without the consent of the owner. This is but declaratory of the previously existing universal law, which forbids the arbitrary and compulsory appropriation of one man's property to the mere private use of another, even though compensation be tendered. For, as was very justly said by the Supreme Court of the United States, that government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of a legislative body, without restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least no Court of Justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority, or ought to be implied from any general

expression of the will of the people.  *Wilkinson vs. Leland,*
2 *Pet.*, 657.

With this restriction, however, the Legislature has, by
virtue of the right or power of eminent domain, the right
to authorize, by compulsory process, the taking of pri-
vate property for public uses, but for public uses only;
and it is for the regulation of the exercise of this high
and delicate power, and to secure full and ample compen-
sation to the party aggrieved, that the constitutional pro-
vision has been adopted.  "It undoubtedly must rest as
a general rule," says Chancellor KENT, (2 *Com.*, 340,) in
the wisdom of the Legislature, to determine when public
uses require the assumption of private property; but if
they should take it for a purpose not of a public nature,
as if the Legislature should take the property of A, and
give it to B, or if they should vacate a grant of property,
or of a franchise, under the pretext of some public use or
service, such cases would be gross abuses of their discre-
tion, and fraudulent attacks on private right, and the law
would clearly be unconstitutional and void."  Whenever,
therefore, the use is in fact public, or has for its object
the public benefit or utility, though coupled with private
objects of gain and emolument, the question of the exer-
cise of the power of eminent domain over private property,
is exclusively one of discretion in the Legislature; but
whether the use, in any particular case, be public or pri-
vate, is a judicial question; for otherwise, the constitu-
tional restraint would be utterly nugatory, and the Legis-
lature could make any use public by simply declaring it
so, and hence its will and discretion become supreme,
however arbitrarily and tyranically exercised.

These general propositions we do not understand to be
controverted; but the question remains, whether the use
to which the right of way through the appellees' land is
sought to be applied, is public, as contended by the appel-
lants, or merely private, and therefore not authorized, as
insisted by the appellees?

The primary object of the charter in this case, as in a great many others granted by the Legislature, was to enable the corporators to work the mineral lands of the State, and to transport the produce of the mines to market. It has certainly been the settled policy of the State, for many years past, to stimulate enterprise and to encourage the combination of capital, for the purpose of developing the large mineral resources in the western portion of the State; as upon their full and successful development depend, in a great measure, the success of the works of internal improvement upon which the State has expended many millions of money. As means of wealth and revenue, therefore, the State has a material interest in the operation of the coal and other mineral lands in that section; and the statute book, within the period of the last thirty or forty years, will abundantly attest the policy of the State upon the subject, by the great number of liberal charters granted, all having for their object the same general purpose as the charter before us. Indeed, among the first of these charters, (Act of 1835, chapter 328,) was one to the appellees, containing provisions and powers in nearly all respects similar to that granted to the appellants. It was under that charter that the railroad was made with which the appellants propose to connect their road; and it is by an express condition in that charter that the right is reserved to the citizens, or other incorporated companies, to make such connection. In all the mining charters granted, as also in the general law providing for the formation of mining corporations, power is given to construct railroads, coupled with the power to obtain the right of way by condemnation. Indeed, without such right, and a general ramification of railroads through the coal fields, many of the most valuable mines could be but very partially and imperfectly worked, and much of the coal could never be got to market. Without the facility of transportation from the mines by railroads,

there would be little or no inducement to the investment of capital, and but small progress could be made in developing the vast mineral wealth of the State, in which the public at large are interested. To furnish the requisite facilities for the construction of railroads for the successful operation of the mines is therefore, in some sense, a public necessity, and that being so, the use of the ways for such roads may well be said to be public, and therefore the right of condemnation exists. That the right should be placed in the hands and under the control of a private corporation, detracts nothing from the public nature of the use. For, as was very correctly said by the Supreme Court of Pennsylvania, in *Hays vs. Risher*, 32 *Penn. St.*, 169, that an individual expects to gain by the use of the way, and has private motives for risking the whole of the necessary investment, and acquires peculiar rights in the work, detracts nothing from the public aspect of it. The same can be said of every railway corporation, and of almost every public enterprise.

Nor is there any want of authority for the proposition that such use as here proposed is of a public nature, and therefore within the right of the eminent domain, as authorized to be exercised by the Constitution. In Pennsylvania, where the constitutional provision on the subject is very similar to our own, the right to take by compulsory process, land for the construction of lateral railways to coal mines, has been very fully sustained, as being for public use, and therefore within the power of the eminent domain; and the case in 32 *Penn. St.*, 169, just referred to, is direct and full to this proposition.

And in the case of *Bankhead vs Brown*, 25 *Iowa Rep.*, 540, cited and relied on by the appellees' counsel, the power of the Legislature to authorize the taking by compulsory process, the right of way to coal or other mines, as being for public use, is fully conceded by the Court.

Our conclusion is, therefore, that the use in question is of a public nature, and that it is competent to the appellants, under the authority of their charter, if there be a reasonable necessity for it, to condemn the right of way for their railroad; and that there was no proper ground for the injunction in this respect.

3. The next question raised by the appellees is, as to the effect of the alleged selling of the franchises by the corporators, for a consideration, before any of the stock was subscribed for, by means of which alone corporate rights could be transferred. In other words, the fraudulent organization of the corporation : it being contended that, by reason thereof, the present holders of the franchises, are not entitled and should not be allowed to exercise the powers granted by the charter, in taking the land of the appellees, to promote the objects of the corporation so organized.

In regard to this proposition, however, it is enough to say, that, though the fact be as alleged, it forms no ground for an injunction against the corporation to stay it in the exercise of its franchises. If there has been a misuser or abuser of the franchises granted to the corporators, the State alone can take advantage of such acts, and that by a direct proceeding for the purpose. No cause of forfeiture can be taken advantage of, or enforced against a corporation, collaterally or incidentally, or in any other mode, than by a direct proceeding, instituted by the State, for that purpose. In this proposition, all the authorities concur. *Ang. & Am. on Corp.*, secs. 776, 777.

4. We come next to the question, whether the appellants have a reasonably convenient way for their railroad over their own premises, and whether there exists any necessity in fact for the condemnation of the appellees' land, for such way?

The general rule doubtless is, as applicable to a railroad to be located between given termini, the Act of

incorporation not defining the precise location, that the managers or directors of the corporation are made the sole judges of what is proper or convenient, as well with reference to location, as to the execution of all other powers granted, as means of attaining the objects of the charter. *Attorney General vs. The Eastern Counties, & N. & E. Railway Cos.,* 2 *Railw. Cas.,* 823 ; *Hill vs. West. Ver't. Railw. Co.,* 32 *Vert. Rep.,* 68 ; *Brainard vs. Clapp,* 10 *Cush.,* 6 ; *Boston Gaslight Co. vs. Old Colony & Newport Railw. Co.,* 14 *Allen,* 444 ; *Ham vs. Salem,* 100 *Mass.,* 350. But this rule can hardly be applicable to a case circumstanced like the present. Here, as alleged, there are two parties having adjoining lands, and one, desiring a right of way to a particular point, or to connect with a certain other way, attempts by compulsory means, to take the way of his neighbor, instead of constructing the road on his own premises. Now, if such be the case, and the road can be made on the land of the party desiring its construction, with anything like reasonable convenience for the accomplishment of the objects authorized to be attained, there certainly exists no public necessity for resorting to the extreme power of compulsory appropriation of private property for the purposes of the way ; and the exercise of such power, under the circumstances, would be arbitrary, and a fraud upon the great fundamental guarantee of private rights. To justify the exercise of this extreme power, where the Legislature has left it to depend upon the necessity that may be found to exist, in order to accomplish the purposes of the incorporation, as in this case, the party claiming the right to the exercise of the power should be required to show at least a reasonable degree of necessity for its exercise. Any rule less strict than this, with the large and almost indiscriminate delegation of the right to corporations, would likely lead to oppression, and the sacrifice of private right to corporate power. Indeed, in the delegation of the

power is implied the condition that it shall only be exercised when, and to the extent, actually found necessary.

This rule. however, may, and generally does involve questions of engineering, and other questions, that a Court of Equity cannot undertake to determine. It is proper, therefore, that they be referred exclusively to the Court specially clothed with jurisdiction and power to pass on the propriety of the inquisition of condemnation. That tribunal can hear testimony of competent persons upon the subject, and have the whole matter explained and illustrated before them, in a manner that would be difficult to accomplish in a proceeding in equity. Besides, the proceedings on the return of the inquisition are intended to be summary and expeditious, and are never attended with the delays that are necessarily incident to suits in chancery. If such questions were allowed to be drawn to a Court of Equity, great inconvenience, and frequently ruinous delays, would likely be the consequence. No ground, therefore, in this respect, was or could be shewn for the injunction.

5. As the inquisition taken in the proceedings of condemnation has been set aside, the allegations of the bill in this case in reference to the misconduct of the sheriff, the irregularities of the proceeding in taking the inquisition, the inadequacy of the damages assessed, and all such like grounds of objection to the inquisition, are no longer subject matters of complaint here. It is proper to say, however, that they formed no ground for the injunction, even if the allegations in regard to them were all true. They were matters exclusively for the Circuit Court in passing upon the question of the ratification or rejection of the inquisition. This Court has, at the present term, in the case of the *West. Md. Railroad Co. vs. Patterson, ante* 125, expressly decided that all such questions can only arise before and be decided by the tribunal to which the inquisition is required to be

returned for ratification or rejection. That a Court of Equity can properly exercise no jurisdiction over such questions.

6. The remaining question has reference to the acts and conduct of the appellants after the taking of the inquisition and before it was acted on by the Circuit Court. The allegation is, that during the pendency of the inquisition before the Circuit Court for ratification or rejection, and before any action was had thereon, the appellants entered upon the premises described in the inquisition, and commenced the work of construction of their road. This was clearly unauthorized, as no rights could be acquired under the inquisition until it was finally ratified, and, in addition to that, the actual payment or tender of the damages assessed. These are conditions precedent to the vesting of the right condemned, under the express terms of the Constitution ; the section before referred to providing that property shall not be taken without just compensation being *first* paid, or tendered, to the party entitled. And if these conditions are disregarded, and the party taking the inquisition enters upon the premises without authority, a Court of Equity will enjoin such unlawful entry until the conditions are fully complied with. This is well settled. *West. Md. R. Co. vs. Owings*, 15 *Md.*, 199 ; *Balto. & Susq. R. Co. vs. Nesbitt*, 10 *How.*, 395 ; *Stacy vs. Vert. Central R. Co*, 27 *Vert. Rep.*, 39. But the injunction in this case was too broad. It should have simply restrained the appellants from entering on the premises attempted to be condemned, until the final action of the Circuit Court on the inquisition, and until actual payment of the damages, in the event of the inquisition being ratified. As, however, the inquisition was set aside before the motion to dissolve the injunction in this case was heard, and the appellants no longer claiming a right to enter the premises under the inquisition, the injunction should have been dissolved. There was no

longer any ground upon which the injunction could be sustained, and, consequently, it should have been dissolved, and the bill dismissed.

> *Order reversed, injunction dissolved,*
> *and bill dismissed.*