916 A.2d 324

**MAYOR AND CITY COUNCIL OF BALTIMORE CITY**

v.

**George VALSAMAKI, et al.**

**No. 55, Sept. Term, 2006.**

Court of Appeals of Maryland.

Feb. 8, 2007.

Elva E. Tillman, Special Solicitor, Sandra R. Gutman, Chief Solicitor (Ralph S. Tyler, City Solicitor, on brief), for appellant.

John C. Murphy, Baltimore, James L. Thompson (Miller, Miller & Canby, Rockville, on brief), for appellees.

Argued before BELL, C.J., RAKER,*WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

---

\* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

CATHELL, J.

■ This case arises from a "quick-take" condemnation [1] by the Mayor and City Council of Baltimore ("the City"), appellant, of a property located at 1924 N. Charles Street ("the Property") in Baltimore, Maryland. The Property consists of a three story building which houses a bar and package goods store known as the Magnet.[2] On March 9, 2006, the City filed a petition for condemnation and a petition for immediate possession and title with the Circuit Court for Baltimore City. On March 15, 2006, prior to the property owner being served with any papers, the Circuit Court granted the City's petitions, ordering that the City "be vested with possession of the fee simple interest in that property known as 1924 N. Charles Street . . . as of the 15th day of March, 2006. . . ." Pursuant to the court's order, title in the Property would vest in the City ten days after personal service of the relevant order on the owner of the Property, George Valsamaki, *et al.*, appellee, unless he filed an answer to the City's petitions within the ten day period "alleging that the City does not have the right or power to condemn title to the property. . . ."

Mr. Valsamaki filed an answer within the requisite time period and a hearing was scheduled and held on April 18, 2006. On May 19, 2006, the Circuit Court issued a memorandum opinion denying the City's petitions for condemnation and

---

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. A quick-take condemnation involves "[t]he immediate taking of possession of private property for public use, whereby the estimated compensation is deposited in court or paid to the condemnee until the actual amount of compensation can be established." *Black's Law Dictionary* 310 (8th ed.2004). *See Bern–Shaw Ltd. P'ship v. Mayor and City Council of Baltimore*, 377 Md. 277, 281 n. 1, 833 A.2d 502, 504 n. 1 (2003); *King v. State Roads Comm'n*, 298 Md. 80, 85–86, 467 A.2d 1032, 1035 (1983) (Quick-take condemnation occurs where "the condemning authority takes possession of the property prior to trial upon payment into court of its estimate of the value of the property taken.").

2. According to statements by appellee's counsel at oral argument, the Property still functioned as an active business, at least up until the time quick-take proceedings were initiated.

immediate possession and title to the Property. On August 8, 2006, after a motion to reconsider had been denied, the City noted a direct appeal to this Court.[3]

The City presents one question for our review:

"Does the City have the burden to prove 'necessity' to proceed with a quick take condemnation?"

We answer this question in the affirmative, holding that under the Code of Public Local Laws of Baltimore City, § 21–16(a),[4]

---

**3.** Pursuant to the Code of Public Local Laws of Baltimore City, § 21–16(c), the parties involved in a quick-take condemnation action in Baltimore City have the right to a direct appeal to the Court of Appeals. Section 21–16(c) states in pertinent part:

"In cases where the City files a Petition for Immediate Taking of title and possession to the said property in fee simple absolute or such lesser estate or interest as is specified in the Petition, title thereto shall irrevocably vest in the Mayor and City Council of Baltimore ten days after personal service of the Petition upon each and every Defendant or, if the Defendants or any of them shall file an answer to the Petition within the said ten day period alleging that the City does not have the right or power to condemn title to the property, then on the date of the trial court's decision or on the date of decision in any appeal from the trial court.

"In the event the Defendants or any of them should file an answer, the court shall schedule a hearing within fifteen days of the date of the filing of an answer, which hearing shall be only for the purpose of contesting the right or power of the City to condemn title to the property. The trial court shall render its decision within fifteen days from the final day of said hearing. *The City or the Defendants or any of them shall have an immediate right of appeal to the Court of Appeals of Maryland from the decision of the trial court.*" (Emphasis added.)

See also Maryland Rule 8–301(a) ("Appellate review by the Court of Appeals may be obtained only: (1) by direct appeal or application for leave to appeal, where allowed by law....").

**4.** The Code of Public Local Laws of Baltimore City, § 21–16, is titled "Quick-take condemnation—in general," and states in subsection (a), titled "Petition for Immediate Taking," that:

"Whenever any proceedings are instituted under Title 12 of the Real Property Article of Public General Laws of the State of Maryland or by the Mayor and City Council of Baltimore for the acquisition of any property for any public purpose whatsoever, the Mayor and City Council of Baltimore, simultaneously with the filing of said proceedings or at any time thereafter, may file a Petition under oath *stating that it is necessary* for the City to have *immediate* possession of, or *immediate* title to and possession of, said property, *and the reasons therefore.*"

the City must demonstrate the reason or reasons why it is necessary for it to have *immediate* possession and immediate title to a particular property via the exercise of a quick-take condemnation.

## I. Facts

This case has its genesis in Baltimore City's urban renewal efforts. On October 25, 1982, the Mayor and City Council of Baltimore adopted Ordinance No. 82–799, which established the Charles North Urban Renewal Plan for the Charles North Revitalization Area.[5] Ordinance No. 82–799 sets forth the goals

---

§ 21–16(a) (emphasis added). It is clear from the emphasized language of the statute that when the Legislature conferred quick-take powers on Baltimore City it did so with the limitation that such powers should be exercised only when the necessity was *"immediate."* We have found no prior Maryland case that addresses the "immediate" language of the enabling statute.

5. The Baltimore City Code provides that renewal projects in Baltimore City must be conducted pursuant to a renewal plan:
 " § 2–5. **Renewal and Conservation Plans.**
 (a) *Project must conform to Plan.*
 No Renewal Project or Conservation Project shall be undertaken by the Department of Housing and Community Development except in accordance with the Renewal or Conservation Plan applicable to the area in which the project is to be undertaken.
 (b) *Renewal Plans.*
 (1) As used herein a Renewal Plan means a plan, as it exists from time to time, for the elimination, correction, or the prevention of the development or the spread of slums, blight, or deterioration in an entire Renewal Area or a portion thereof. When a plan is applicable to less than an entire Renewal Area, it shall include a description of the boundaries of the area to which it applies.
 (2) The plan shall include a land use map showing the proposed use of all land within the area to which the plan is applicable, including the location, character, and extent of the proposed public and private ownership.
 (3) The plan shall be sufficiently complete to define such land or property acquisition, acquisition of interests therein, demolition and removal of structures, disposition of land or property or interests therein, improvements, and programs of renovation or rehabilitation and conservation, and activities to effect substantial environmental change, as may be proposed to be undertaken or carried out in the area to which the plan is applicable; and the plan shall include a statement of the methods and standards under which the same is to be accomplished and the necessary controls to be applied in order to

and objectives of the Charles North Urban Renewal Plan as follows:

"The basic goal of this Urban Renewal Plan is the revitalization of the Charles/North area in order to create a unique mixed-use neighborhood with enhanced viability, stability, attractiveness, and convenience for residents of the surrounding area and of the City as a whole. The objectives of this Plan include:

a. protecting existing residential neighborhoods;

b. establishing a positive and identifiable image for the Charles/North Area compatible with the surrounding residential areas;

c. accommodating the expansion of existing retail small business;

d. promoting new retail business activity in the area;

e. establishing and enforcing uniform comprehensive design and rehabilitation standards that will enhance the physical environment of the business area through private investment;

f. bringing about a general physical improvement of the area through coordinated public improvements;

g. providing a pleasant environment for the staging of year-round promotional activities and events; and

h. removing blighting influences and creating development lots for commercial uses."

The Property is located within the boundaries of the Charles North Revitalization Area. In June 2004, the Mayor and City

---

effect rehabilitation and conservation by owners of existing properties.

(4) The plan shall set out zoning changes, if any.

(5) The plan also shall indicate the nature of the restrictions, conditions, or covenants, if any, which are to be incorporated in deeds or contracts for the sale, lease, use or redevelopment of land or property within the area to which the plan is applicable.

(6) In addition, the plan shall state the reasons for the various provisions which it contains."

Baltimore City Code, Art. 13, § 2–5 (2006).

Council of Baltimore amended the Charles North Urban Renewal Plan by Baltimore City Ordinance No. 04–695, which specifically authorized the acquisition of the subject Property "by purchase or by condemnation, for urban renewal purposes...."

The issue before us arose on March 9, 2006, when the City acted on Ordinance No. 04–695 and filed a petition for condemnation and a petition for immediate possession of and title to the Property in the Circuit Court for Baltimore City. The petition for condemnation stated in pertinent part:

"[The City] is duly authorized to acquire the Property Interest hereinafter described [the Property] for public purposes by the following Ordinance(s) of the Mayor and City Council of Baltimore, viz: Article 13 § 2–7(h) [6] of the Baltimore City Code (2000 edition), approved November 11, 1999 and Ordinance No. 04–695, approved June 23, 2004."

. . .

"This property will be used for redevelopment purposes; namely in the Charles North Project area."

---

**6.** Baltimore City Code, Article 13, § 2–7(h) provides, in pertinent part:
"(h) *Acquisition of deteriorated or abandoned property.*
 (1) Subject to the prior approval of the Board of Estimates, the Department may acquire, for and on behalf of the Mayor and City Council of Baltimore, any single-family or multiple-family dwelling unit or other structure within the boundary lines of Baltimore City, by purchase, lease, condemnation, gift or other legal means, for development and redevelopment, including but not limited to the renovation, rehabilitation and disposition thereof, when the Commissioner has determined:
 (i) that such dwelling unit or other structure has deteriorated to such extent as to constitute a serious and growing menace to the public health, safety and welfare;
 (ii) that such dwelling unit or other structure is likely to continue to deteriorate unless corrected;
 (iii) that the continued deterioration of such dwelling unit or other structure may contribute to the blighting or deterioration of the area immediately surrounding the said dwelling unit or other structure; and
 (iv) that the owner of such dwelling unit or other structure has failed to correct the deterioration thereof."

The petition for immediate possession and title stated in pertinent part: "That it is necessary for [the City] to acquire immediate possession and title to the said property interest as appears from the affidavit of William N. Burgee, Director of Property Acquisition and Relocation, Department of Housing and Community Development, attached hereto and prayed to be taken as a part hereof." Relevantly, the attached affidavit read: "The property known as 1924 N. Charles Street, Block 3602, Lot 04[,] must be in possession of the Mayor and City Council of Baltimore at the earliest possible time *in order to assist in a business expansion in the area.*" [Emphasis added]. There was no attempt in the affidavit to specify the immediacy of the necessity other than a general statement that it was needed "at the earliest possible time" "to assist in a business expansion." There was no discussion of "why." [7]

On March 15, 2006, the Circuit Court granted the City's petitions, as discussed *supra.* Mr. Valsamaki, the owner of the Property, timely filed an answer challenging the City's power to condemn title to the Property and a hearing was set for April 18, 2006.

Prior to the April 18, 2006, hearing, Mr. Valsamaki attempted to obtain discovery by serving interrogatories and notices of depositions on various city officials involved with the Charles North Urban Renewal Plan, namely, Mr. Burgee and Paul J.M. Dombrowski (an official at the Baltimore Development Corporation responsible for the Charles North Project). Due to the abbreviated time period in which quick-take condemnation proceedings generally take place, the City would not have to respond under the normal discovery time line before the April 18, 2006, hearing.[8] Therefore, Mr. Valsamaki

---

7. In essence, the City appears to have been using its quick-take power to "stockpile" or assemble properties.

8. Section 21–16(c) of the Public Local Laws of Baltimore City provides that an individual has ten days after being served with a petition for immediate taking of possession and title to property to file an answer challenging the City's right or power to condemn. In that event, the court must schedule a hearing within fifteen days of the date of the

moved to shorten the time for discovery in order to ensure a response before the hearing. On April 4, 2006, the Circuit Court for Baltimore City denied that motion and, consequently, the City did not comply with the discovery requests prior to the April 18, 2006, hearing, and Mr. Valsamaki was forced to litigate without the aid of discovery practices, practices that would have been available in a regular condemnation action.

On April 18, 2006, the hearing took place. The Charles North Urban Renewal Plan, illustrated by Ordinance No. 82–799, was introduced into evidence by the City, along with Ordinance No. 04–695, a map of the renewal area, and a photograph of the Property. The City called two witnesses at the hearing. The first witness was Mr. Dombrowski, the Director of Planning and Design for the Baltimore Development Corporation and also the Project Manager for the Charles North area. On cross examination by Mr. Valsamaki's counsel, the following colloquy occurred:

"Q Were you aware of the Affidavit by Mr. Burgee stating the necessity for, the reason for, necessity for the taking?

A I was aware that an Affidavit had been presented to the Law Department.[9]

---

filing of the answer. Therefore, a hearing would take place within 25 days of an individual being served with a petition. Pursuant to Maryland Rule 2–421 ("Interrogatories to parties") and Rule 2–422 ("Discovery of documents and property"), a party has 30 days to respond upon being served with a discovery request for interrogatories or documents. Additionally, Rule 2–417 ("Deposition—Written questions") provides that a party has 30 days from receipt of service of the notice to serve their own cross questions. So, not only is the time to prepare for trial drastically shortened in a quick-take action, but discovery in the ordinary course of litigation is virtually impossible. Important procedural due process protections are conspicuously absent from this stage of the proceeding in quick-take actions.

Because the issue of the facial constitutionality of this public local law process has not been adequately presented to the court, we shall not directly resolve it, although we shall express certain concerns.

9. The Baltimore City Solicitor's office is referred to as the "Law Department." It appears that the practice of the Baltimore Development Corporation ("BDC") is to first attempt negotiations for the

Q And are you aware of the contents of that Affidavit?

A I had not reviewed it before it was sent.

Q Do you know what is meant by a business expansion in the area?

A I think so. It means, to us, at least, the opportunity to provide for additional business expansion opportunities.

Q *Is there any plan for the development of this property?*

A *The specific property?*

Q Yes.

A *Not as yet because the procedure we follow is through a request for proposal procedure as you well know.*

Q So—

A When we assemble the site, we put it out for public offering for redevelopment.

Q So when the Amendment was adopted in '04, the City really didn't have any idea what it was going to use the property for?

A *We wanted mixed use development, but we had no specific plans because they follow on with the proposals.* They come in as part of a proposal.

. . .

Q *But you really, at this point in time, and at the time you adopted the amendment, you really didn't have any plan for this property; did you?*

A *Did not have a specific plan for the property.* We are seeking mixed use development for that assemblage of properties.

purchase of properties. Should those negotiations fail to result in a favorable purchase price for the City, or a purchase at all, the BDC turns to the Law Department to acquire properties via the exercise of eminent domain. Apparently, it is the decision of the Law Department as to whether to initiate traditional condemnation proceedings or to pursue a quick-take condemnation action.

Q That onset of seeking mixed use development, is that set forth in Exhibit 1 at all?

A I believe so. I believe the—

Q Could you point that out, then?

THE COURT: I'm sorry. Mr. Clerk, could you hand this back, please, to Counsel while he's—thank you.

A I'm referring ... to page 1 of the Urban Renewal Plan, the very bottom of the page, 'Item 2, Plan Objectives.[10] The basic goal of this Urban Renewal Plan is the revitalization of the Charles North area in order to create a unique mixed-use neighborhood with enhanced viability, stability, attractiveness and convenience for residents, et cetera. So, I think this is—

Q I'm trying to understand this. This mixed-use concept then is just a conglomeration of different uses; is that right?

A It's exactly as it says, 'a mixed use,' mixed uses, yes.

Q So then there's no—I'm trying to relate this to the Affidavit where it says the expansion of a business in the area—'a business.' Was there any particular business that was referred to, you had in mind?

A No.

Q So you wouldn't be able to say that there was any particular type of business that you had in mind for this property or this block?

A Again, I would say that the overriding goal is to create additional retail business opportunities as well as housing opportunities, job opportunities, office opportunities, whatever.

Q I just see in the plan the various permitted uses, include office, residential, community business, community commercial, central commercial, industrial. All those are basically permitted. Is that not right?

---

10. *See* Ordinance 82–799's goals and objectives, *supra.*

A As appropriately zoned, yes.

Q Excuse me?

A If they are appropriately zoned, yes.

Q But they are allowed by the plan, the bottom of page 2, the top of page 3. All these uses are allowed. Is that not right?

A In the plan area, yes. In the overall plan area.

Q *So as I understand what you're saying then, you really didn't have any specific plan for this property or for the plan when you adopted the Urban Renewal areas?*

A *Not a specific plan. We would choose that when proposals came in."* [Emphasis added.] [11]

Mr. Valsamaki's counsel continued, asking Mr. Dombrowski specifically about the City's need for immediate possession of the Property:

"Q Is there any reason that it's necessary to have immediate possession?

A Well, immediate possession to us means getting something going after 20–some years of non investment in the area or 30 years. It's a matter of trying to assemble the site, given the fact that we know it takes time to go through this kind of procedure with appraisals, et cetera, and relocation assistance in Mr. Valsamaki's case. So we

---

11. Under the process utilized, while the City retains the power of approval and acceptance, the actual initial discussions as to how a property will be used are generated by private developers. This process is know as a "Request for Proposals" ("RFP"). It is apparent from the record that the City's process for redeveloping the Charles North Revitalization Area is first to obtain all, or at least many, of the properties targeted for renewal pursuant to Ordinance No. 04–695 (whether by purchase or condemnation) and then to issue an RFP to garner development proposals from private developers. The City would then choose from amongst the proposals, should any be forthcoming. Under these circumstances, an owner of a property who is resisting condemnation has no knowledge as to what use his or her property will be put. In fact, not only is a property owner lacking of this knowledge, but the City is ignorant of specific proposals as well. The parties will only know what the use will be when proposals are received and one is chosen.

are looking for the most expeditious way to get development going and we deferred to the Law Department to tell us how to do that.

Q I don't understand. If you haven't even started the RFP process, why it's necessary to have immediate possession, why you could [not] go the normal route and just have an ordinary condemnation in say six, nine months, something like that. I'm missing—

A We will have an RFP done in a matter of weeks if we know that we can move ahead on the property.

Q You don't really know whether anybody's going to respond to the RFP, do you?

A No, we never know that in advance."

The City next called M.J. "Jay" Brodie, President of the Baltimore Development Corporation, as a witness. The City first asked Mr. Brodie why the subject Property was being acquired:

"Q There are several specific questions that I would like to have you elaborate upon now since you've given us sort of an overall view of the Urban Renewal process. What is the reason for—can you elaborate upon the specific reason for acquiring this property, if you could just elaborate upon that for the Court?

A Sure. Well, this property is part of a larger assemblage and it's our judgment in this case, put in front of the City Council and approved by them that the parcels of this size are necessary for the renewal of the area...."

On cross examination, Mr. Valsamaki's counsel asked Mr. Brodie to elaborate on whether there was a specific redevelopment plan for the Property:

"Q And you would agree with Mr. Dombrowski that at this point in time there is no specific plan, either for this property or for that lot in which this property [is] located; is that correct?

A Actually, I would not agree with Mr. Dombrowski. *I believe on the contrary that the plan in front of the City*

*Council was as specific as most urban renewal plans are at that point in time.* It calls for specific land uses. It delineates disposition lots. It proposes—in most cases, not in this case—changes of zoning. So it is not atypical in any sense.... It is the classic one step at a head [time] moving toward a future redevelopment of a particular site.

Q Tell me what specific land uses are called for in the plan for this property?

A The ones that are in the plan. I don't have the plan in front of me.

Q Well, let me get that.

[THE CITY]: I think [we] need the exhibit—

THE COURT: It's 1.

A *So there are obviously a spectrum of uses that are permitted. That [is] as specific as most urban renewal plans are.* The reason is—and there's a reason. The reason is, in planning of, let's say 30 or 40 years ago, there was an attempt to pinpoint a specific use for each property such as business or residential or industrial. The organic view of cities that most of us have adopted, is that's really nearsighted. My nearsightedness has been corrected to 20/20 vision, so in planning terms, we think mixed use is much more sensitive and appropriate for City redevelopment and therefore, the old-fashioned idea of pinpointing a use on a specific property versus allowing a mixture of uses, that's where we are today. That's why the plan, as Mr. Dombrowski quoted, calls for a mixed use redevelopment.

Q You don't really know what specific use this property will be devoted to under the plan?

A ... I've just told you. You may not like the answer, but that's the answer.

Q That you don't know?

A No, sir. *That it's as specific as the description of mixed uses in the Urban Renewal Plan are.*

. . .

Q And you would confirm Mr. Dombrowski's testimony that at this point no RFP has been prepared?

A That's correct.

Q *No RFP has been issued.*

A *That's correct.*

Q *There have been no developers identified for this property.*

A *That's correct.*

Q And the specific plan that will eventually come into existence for this property will be that proposed by a developer and approved by [the] Baltimore Development Corporation; is that correct?

A I would say that is not correct. . . . *The specific plan as I've just described in the Urban Renewal Plan, the specific design for redevelopment will come out of a proposal by a private sector developer."* [Emphasis added.]

On May 19, 2006, the Honorable John Philip Miller issued a memorandum opinion and order for the Circuit Court. In so doing, the court analyzed whether the City's petition for condemnation and petition for immediate possession and title outlined a "public interest of sufficient necessity to award [the City] with immediate possession as called for under the language of § 21–16." The trial court utilized the affidavit of Mr. Burgee, the testimony of the City's witnesses presented at the hearing, and the exhibits introduced at the hearing by the City as evidence in reaching its determination. After a review of the applicable law and the evidence at hand, the trial court denied the City's petitions. Judge Miller, writing for that court, stated:

"In considering the arguments and the evidence presented by the parties, this Court finds that [the City] fails to demonstrate sufficient grounds which warrant the findings of necessity requisite for the immediate taking. The [City] impassively asserts that the Charles North Project will

likely come to a temporary halt unless [the City] is awarded the Property in Interest immediately. The Court, based on all [the] evidence, is not satisfied that the [City] has met its burden. The [City] has failed to submit to the Court either a contract, a focused development plan as it pertains to the Property in Interest, or even a Request for Proposal ... supporting its contentions and establishing necessity required under § 21–16."

In support of its conclusion, the trial court cited to the recent controversial United States Supreme Court decision in *Kelo v. City of New London, Connecticut,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). The trial court acknowledged that under *Kelo,* "not only will economic development qualify as 'public use' for the purposes of eminent domain, but that also given 'a carefully considered development plan,' a plan that is comprehensive in nature and one that was preceded by thorough deliberation, a city's taking of private property will comport with the demands of the Fifth Amendment." After applying the *Kelo* holding to the matter at hand, however, the trial court found that it was "not satisfied that the [City] ha[d] demonstrated the necessity of the taking pursuant to any specifically outlined plan or contract, or as called for by § 21–16 of the Public Local Laws of Baltimore City."

On May 26, 2006, the City filed a motion for reconsideration to alter or amend judgment. On July 11, 2006, the Circuit Court denied the City's motion. Thereafter, on August 8, 2006, the City noted a direct appeal to this Court.

## II. Discussion

We initially note that the issue of an "immediacy requirement" in quick-take condemnations appears to be an issue of first impression for this Court and has not been the subject of much discussion elsewhere. In a jurisdiction in which the issue has been discussed, the courts have, albeit sometimes as dicta, recognized such a requirement.[12]

---

**12.** In *City of Chicago v. First Bank of Oak Park,* 178 Ill.App.3d 321, 127 Ill.Dec. 552, 533 N.E.2d 424 (1988), the intermediate appellate court of

■ The City argued in the Circuit Court, and argues now on appeal, that it does not have the burden to prove necessity in order to proceed with a quick-take condemnation proceeding for immediate possession and title to a property. In

Illinois, among other claims, dealt with the issue of "whether the trial court applied the proper standard for a 'quick-take' proceeding." 178 Ill.App.3d at 323, 127 Ill.Dec. 552, 533 N.E.2d at 425. The court noted: "[T]he Code sets forth the allegations that must be contained in the motion for immediate vesting of title (quick-take) which include 'the formally adopted schedule or plan of operation for the execution of [condemnor's] project * * *; [and] *the necessity for taking such property in the manner requested in the motion.'* " *Id.* at 325–26, 127 Ill.Dec. 552, 533 N.E.2d at 426 (emphasis added) (quoting Ill.Rev.Stat.1985, ch. 110). That court noted that in addition to determining the authority of the condemnor, it had to determine " 'that such right is not being improperly exercised in the particular proceeding.' " *Id.* at 326, 127 Ill.Dec. 552, 533 N.E.2d at 426 (quoting Ill.Rev.Stat.1985, ch. 110). When that court, as has this court in many cases, noted that a condemnor had a burden of establishing "a *prima facie* case of the necessity," it indicated, as dicta, that it also had the requirement of establishing immediacy. *Id.* at 327, 127 Ill.Dec. 552, 533 N.E.2d at 427.

In another intermediate appellate court case from Illinois, *Department of Public Works & Buildings v. Vogt,* 51 Ill.App.3d 770, 9 Ill.Dec. 53, 366 N.E.2d 310 (1977), Vogt argued that the condemnor had utilized its quick-take power based on its representations that construction was so imminent that the vesting of title was required. Yet, no construction had commenced, nor were there even any plans finalized *four* years later. The Illinois statutes required the condemnor to specify why there was "the necessity for taking such property in the manner requested...." *Id.* at 777, 9 Ill.Dec. 53, 366 N.E.2d at 314. The trial court had stated:

"The date of filing of an Eminent Domain suit is of paramount importance because the date of filing is the date used for evaluation of the subject property. The Court takes judicial notice of the fact that property values have increased steadily during the past ten years in this county, and that it would be manifestly unfair to permit any condemning authority to hurriedly file its condemnation petition when property values are relatively low, and then not be in a position to try the case until several years later when property values are relatively high."

*Id.* at 775, 9 Ill.Dec. 53, 366 N.E.2d at 314.

The Illinois intermediate appellate court held that "it is an abuse of power for a condemning authority to 'quick take' property under the pretense of imminent necessity when there exists only some possibility of need at an indefinite future date." *Id.* at 779, 9 Ill.Dec. 53, 366 N.E.2d at 316. Furthermore, the court found that under the facts of the case, "[c]learly, petitioner knew that the construction on the project would not commence directly after the 'quick take.' " *Id.* at 780, 9 Ill.Dec. 53, 366 N.E.2d at 317.

opposition, Mr. Valsamaki argues that § 21–16 of the Public Local Laws of Baltimore City statutorily establishes a requirement that the City show why it is necessary for it to take *immediate* possession and title to property, and that in so doing the City must also show that any taking is for a public use consistent with Article XI–B of the Maryland Constitution and the Fifth and Fourteenth Amendments of the United States Constitution.

 Condemnation is a function of the State's power of eminent domain. Eminent domain is defined as "[t]he inherent power of a governmental entity to take privately owned property, esp. land, and convert it to public use, subject to reasonable compensation for the taking." *Black's Law Dictionary* 562 (8th ed.2004). "[T]he power of eminent domain adheres to sovereignty and requires no constitutional authority for its existence." *Lore v. Board of Public Works,* 277 Md. 356, 358, 354 A.2d 812, 814 (1976) (citing *Riden v. Phila., B. & W.R.R. Co.,* 182 Md. 336, 339, 35 A.2d 99, 100 (1943)). The power of eminent domain, however, is limited by both the Constitution of Maryland and the United States Constitution. The right to private property, and the protection of that right, is a bedrock principle of our constitutional republic. This is explicit in the federal constitution. The Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment,[13] states that, "No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V (emphasis added); *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897); *King v. State Roads Comm'n,* 298 Md. 80, 83, 467 A.2d 1032, 1033–34 (1983). Alexander Hamilton described "the security of Property" as one of the "great obj[ects] of Gov[ernment]." 1 Records of the Federal Convention of 1787, p. 302 (M. Farrand ed.1934);

---

**13.** "... [N]or shall any State deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV.

*Kelo,* 545 U.S. at 497–98, 125 S.Ct. at 2673 (O'Connor, J., dissenting).

As Justice Chase wrote for the Supreme Court in *Calder v. Bull,* 3 Dall. 386, 1 L.Ed. 648 (1798):

> "An ACT of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority.... A few instances will suffice to explain what I mean.... [A] law that takes property from A. and gives it to B: It is against all reason and justice, for a people to entrust a Legislature with SUCH powers; and, therefore, it cannot be presumed that they have done it. The genius, the nature, and the spirit, of our State Government, amount to a prohibition of such acts of legislation; and the general principles of law and reason forbid them. The Legislature ... cannot ... violate ... the right of private property. To maintain that our Federal, or State, Legislature possesses such powers, if they had not been expressly restrained; would, in my opinion, be a political heresy, altogether inadmissible in our free republican governments."

3 Dall. at 388–89 (emphasis deleted). Justice Story further expounded upon the importance of property rights in *Wilkinson v. Leland,* 2 Pet. 627, 7 L.Ed. 542 (1829), stating:

> "That government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of a legislative body, without any restraint. The fundamental maxims of a free government seem to require, that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming, that the power to violate and disregard them; a power so repugnant to the common principles of justice and civil liberty lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people. The people ought not to be presumed to part with rights so vital

to their security and well being, without very strong and direct expressions of such an intention."

2 Pet. at 657.

■ Thus, it is evident that government, through its federal and various state legislatures, does not have the authority to take a private individual's property and convey it to another private individual for a purely private purpose. *Kelo*, 545 U.S. at 477–78, 125 S.Ct. at 2661 ("[I]t has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation."). The Supreme Court elaborated upon this in *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), stating: "[T]he Court's cases have repeatedly stated that 'one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid.'" 467 U.S. at 241, 104 S.Ct. at 2329 (citing *Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 80, 57 S.Ct. 364, 376, 81 L.Ed. 510 (1937)). *See, e.g., Cincinnati v. Vester*, 281 U.S. 439, 447, 50 S.Ct. 360, 362, 74 L.Ed. 950 (1930); *Madisonville Traction Co. v. St. Bernard Mining Co.*, 196 U.S. 239, 251–52, 25 S.Ct. 251, 255–56, 49 L.Ed. 462 (1905); *Fallbrook Irrigation District v. Bradley*, 164 U.S. 112, 159, 17 S.Ct. 56, 63, 41 L.Ed. 369 (1896). "A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void." *Midkiff*, 467 U.S. at 245, 104 S.Ct. at 2331.

The State of Maryland's jurisprudence in this instance is very similar to that of the federal government. The Maryland Constitution provides that: "The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation." Md. Const. art. III, § 40; *see also Prince George's County v. Collington Crossroads, Inc.*, 275 Md. 171, 188, 339 A.2d 278, 287 (1975)

("[W]here the predominant purpose or effect of a particular condemnation action has been to benefit private interests, this Court has held that the taking is not for a 'public use' within the meaning of Art. III, § 40, of the Maryland Constitution.").

The Maryland Constitution, Article XI–B, § 1, does, however, constitutionally provide specific authority for condemnation actions in Baltimore City:

"The General Assembly of Maryland, by public local law, may authorize and empower the Mayor and City Council of Baltimore:

(a) To acquire, within the boundary lines of Baltimore City, land and property of every kind, and any right, interest, franchise, easement or privilege therein, by purchase, lease, gift, condemnation or any other legal means, for development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof; and

. . .

All land or property needed, or taken by the exercise of the power of eminent domain, by the Mayor and City Council of Baltimore for any of the aforementioned purposes or in connection with the exercise of any of the powers which may be granted to the Mayor and City Council of Baltimore pursuant to this Article is hereby declared to be needed or taken for public use." [14]

Chapter 162 of the Acts of 1947. Furthermore, Article III, § § 40A–40C of the Maryland Constitution gives the General Assembly authority to enact legislation providing powers to certain local (and state) entities for immediate takings, or quick-take condemnation actions, for different pur-

---

14. Even if this *per se* declaration sufficed to establish public use under the provisions of the State Constitution, which we do not accept or reject, it would have no impact on the protections afforded property owners under the Fifth and Fourteenth Amendments of the Federal Constitution. Nor does it justify the deprivation of process that may occur when the quick-take power—as opposed to regular condemnation power—is used.

poses. *Bern–Shaw*, 377 Md. at 281–82 n. 1, 833 A.2d at 504 n. 1; *J.L. Matthews, Inc. v. Maryland–National Capital Park and Planning Comm'n*, 368 Md. 71, 90, 792 A.2d 288, 299 (2002); *King*, 298 Md. at 86, 467 A.2d at 1035 (" 'Quick-take' condemnation proceedings are authorized in limited circumstances by § § 40A through 40C of Art. III of the Constitution of Maryland."). These entities are Baltimore City, Baltimore County, Montgomery County, Cecil County, the State Roads Commission, and the Washington Suburban Sanitary Commission. Article III, § 40A, relevant to Baltimore City, states:

"The General Assembly shall enact no law authorizing private property to be taken for public use without just compensation, to be agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation, but where such property is situated in Baltimore City and is desired by this State or by the Mayor and City Council of Baltimore, the General Assembly may provide that such property may be taken immediately upon payment therefor to the owner or owners thereof by the State or by the Mayor and City Council of Baltimore, or into court, such amount as the State or the Mayor and City Council of Baltimore, as the case may be, shall estimate to be the fair value of said property, provided such legislation also requires the payment of any further sum that may subsequently be added by a jury. . . . "

Md. Const. art. III, § 40A.

The constitutional provisions in regard to quick-take condemnation actions in Baltimore City are effectuated, in a limited manner, by Code of Public Local Laws of Baltimore City, § 21–16. Chapter 420 of the Acts of 1972. Section 21–16 provides the Mayor and City Council of Baltimore with the authority to institute quick-take condemnation actions by filing "a Petition under oath stating that it is *necessary* for the City to have *immediate* possession of, or *immediate* title to and possession of, said property, *and the reasons therefore.*" § 21–16(a) (emphasis added). The court may then grant immediate possession *"[i]f it appears from a Petition for Immediate Possession,* with or without supporting affidavits or sworn

testimony, that the public interest requires the City to have immediate possession of said property...." § 21–16(d) (emphasis added).[15]

■ By requiring the City to establish under oath the immediacy of the need for quick-take condemnation (as opposed to regular condemnation), the Legislature has imposed the burden of proof upon the City to establish that immediate need—not imposed a burden on the property owner to prove the contrary. Quick-take condemnation, as established by § 21–16, is to be utilized by the City only when the public interest demands that it is necessary for property to be *immediately* taken. *See also* Nicole Stelle Garnett, *The Public–Use Question as a Takings Problem,* 71 Geo. Wash. L.Rev. 934, 974 n. 257 (2003) *("See, e.g.,* Steven Elrod, THE POWER OF EMINENT DOMAIN—INTRODUCTION AND OVERVIEW § 1.35 (Supp.1998) (observing that 'quick-take is intended to be used only when the immediate use of the property is necessary and the project cannot wait until the procedural safeguards of traditional condemnation have been satisfied').")*. It is not a power to be utilized for regular condemnation purposes.[16]

---

**15.** In contrast, the statutory and constitutional provisions conferring quick-take power on the State Roads Commission, do not expressly prescribe the requirement of immediacy. Accordingly, the City's quick-take powers are not the equivalent of the Commission's.

**16.** There is some indication from the record that the City, generally, may be misusing its quick-take condemnation power. Discussing when quick-take is used, the City's attorney stated at oral argument that: "We make a decision to take it by quick-take because we feel that the owner has been afforded every opportunity based upon the process we have in place." Additionally, at the hearing before the Circuit Court, the City's counsel made several statements concerning when it thought quick take was appropriate. The City stated: "I think that when negotiation has taken place over a few years, then quick take becomes the appropriate measure to take to acquire a property" and "I think that 21–16 [the quick-take statute] was actually set up so that when there was a glitch in the system to acquire property, that there would be another tool for acquisition...."

Quick-take is not to be used simply because negotiations to purchase the property have failed. If the negotiation process has not resulted in the sale of a property, the City has the ability to initiate regular

This statutory scheme provided by § 21–16 is essential to our determination of the issues in the case *sub judice*. As Judge Harrell, writing for the Court in *J.L. Matthews*, instructed:

> "[I]t is important to note that we have 'underscore[d] the principle that condemnation actions are exclusive special statutory actions for the exercise of the eminent domain power.' *Utilities, Inc. [of Md. v. Wash. Suburban Sanitary Comm'n]*, 362 Md. [37, 49–50], 763 A.2d [129,] 135 [(2000)] (citing *Sollins v. Baltimore County*, 253 Md. 407, 252 A.2d 819 (1969)). *Thus, the statutory scheme delineating [a party's] condemnation authority informs our consideration of the issues before us.*"

*J.L. Matthews*, 368 Md. at 91, 792 A.2d at 300 (emphasis added). *See* also Gregory G. Schwab, *The Maryland Survey: 2001–2002 Recent Decisions: The Court of Appeals of Maryland*, 62 Md. L.Rev. 840, 845–46 (2003) ("Maryland has an extensive statutory framework to guide governmental entities in the exercise of their eminent domain powers, set forth both in the Maryland Constitution an d in the Maryland Code. Political subdivisions and public entities have no condemnation powers other than those conferred upon them by the State. Therefore, *where the State has conferred condemnation authority, these governmental entities must strictly follow the statutory procedures.*" (Emphasis added) (Footnotes omitted)).

### An "Immediate" Necessity

The City asserts that "[t]his Court has held that the burden of proving lack of necessity in a quick take condemnation suit rests upon the party who objects to the proceeding. . . ." In support of this contention, the City cites to *Free State Realty Co., Inc. v. City of Baltimore*, 279 Md. 550, 369 A.2d 1030 (1977) and *County Commissioners of Frederick County v.*

---

condemnation proceedings which provide all of the procedural due process protections that are absent from a quick-take condemnation proceeding.

*Schrodel,* 320 Md. 202, 577 A.2d 39 (1990). This argument, however, does not acknowledge the plain language of § 21–16 of the Public Local Laws of Baltimore City, which imposes the requirement that the City first show "the reasons," i.e., the necessity for immediate possession by quick-take condemnation. Furthermore, the City misconstrues the language in *Free State,* and the cases cited therein, to impose a burden upon Mr. Valsamaki which does not exist in the present instance. The threshold issue in this case is whether the City provided sufficient reasons to show a necessity for it to have *immediate* possession of and title to the Property under § 21–16, not whether there was a sufficient showing of "public use." As discussed *infra,* the City has failed to demonstrate such *immediate* necessity.

As indicated above, there is a distinction to be made between the two types of condemnation addressed in our case history: regular condemnation and quick-take condemnation. The majority of our cases deal with instances of regular condemnation, rather than quick-take condemnation. There is some confusion extant because the courts have a tendency to mix the interpretation of the two. In the case *sub judice* we are only concerned with quick-take condemnation in Baltimore City. The quick-take power is statutorily provided by § 21–16 of the Public Local Laws of Baltimore City and, as such, our determination as to the City's use of quick-take condemnation is governed by that statute.

Judge Eldridge, writing for the Court in *Green v. High Ridge Association, Inc.,* 346 Md. 65, 695 A.2d 125 (1997), *in the context of traditional condemnation proceedings,* discussed the question of whether there is a "necessity" for a condemnation:

> "The Court has held ... that the question of whether there is a 'necessity' for a particular condemnation is primarily for the legislative and/or executive branches of government. *See, e.g., County Comm'rs v. Schrodel,* 320 Md. 202, 216–217, 577 A.2d 39, 46 (1990); *Anne Arundel County v. Burnopp,* 300 Md. [343,] 348–349, 478 A.2d [315,] 318–319 [(1984)]; *Wash. Suburban Sanitary Comm. v. Santorios,*

234 Md. 342, 346, 199 A.2d 206, 208 (1964) (' "The necessity is for the condemnor and not for the courts to decide," ' quoting with approval 1A *Nichols On Eminent Domain,* § 4.11[3] (3d ed.)). . . .

"The determination by a condemning authority that a particular taking is 'necessary' will not be set aside by the courts unless the condemnor's decision 'is so oppressive, arbitrary or unreasonable as to suggest bad faith,' *Anne Arundel County v. Burnopp, supra,* 300 Md. at 349, 478 A.2d at 318. Moreover, the burden is upon those challenging the condemnation to establish such bad faith, *County Comm'rs v. Schrodel, supra,* 320 Md. at 217, 577 A.2d at 46."

*Green,* 346 Md. at 79–80, 695 A.2d at 132. Thus, our statement in Green is that the burden lies with the property owners who allege bad faith having the burden of proving that bad faith. It, alone, does not relieve condemning authorities of any burden they may have of establishing a prima facie case of inherent public use.

The City relies on a line of cases derived from *Washington Suburban Sanitary Commission v. Santorios,* 234 Md. 342, 199 A.2d 206 (1964). These cases, however, are distinguishable from the § 21–16 quick-take condemnation proceedings at issue in the case *sub judice* where there is both a *statutory* requirement that the City show necessity for, i.e., give the reasons for, immediate possession and title to a property, and the requirement that the City satisfy the "public use" standard.

The City primarily relies on *Free State,* a case that also involved the condemnation of a property for urban renewal purposes. In *Free State* it was argued that the Mayor and City Council of Baltimore "improperly or unlawfully exercised its 'quick take' powers of eminent domain." 279 Md. at 551, 369 A.2d at 1030. There, as in the case *sub judice,* the City filed a petition to condemn and a petition for immediate possession. An affidavit was attached to the petition for

immediate possession stating why immediate possession was necessary:

> "The affidavit ... said that the dwelling ... 'ha[d] deteriorated to such extent as to constitute a serious and growing menace to the public health, safety and welfare,' which was 'likely to continue to deteriorate unless corrected, and [that] such continued deterioration m[ight] contribute to the blighting or deterioration of the immediately surrounding area thereto.' It further recited that the owner had 'failed to correct the deterioration thereof as evidenced by the violation notice[s] attached....'"

*Id.* at 552, 369 A.2d at 1031. The "trial court considered the right to condemn and the right to immediate possession as a preliminary matter." *Id.* at 553, 369 A.2d at 1031. Testimony was introduced from a building inspector who testified "that when he visited the subject property ... he observed that '[w]indows and doors were broken,' there 'was rubbish and debris inside,' 'the house was vacant' and 'the grounds were unsanitary.'" *Id.* at 553, 369 A.2d at 1031–32. Furthermore, another city employee testified that the property had been boarded and cleaned up on September 25, 1974, "but that when he last visited the property on July 13, 1975, three days before the hearing on the petition, there had been no effort made to rehabilitate the dwelling." *Id.* at 553, 369 A.2d at 1032. The Court conducted a review of Maryland's constitutional and statutory authority, as explicated *supra,* and concluded that the City, in that case, had authority to acquire the subject land. There, the evidence of immediate need and necessity was much stronger that the sparse evidence in the present case where the City, in essence, failed to expand upon the minimal affidavit it had filed.

■ Discussing the sufficiency of evidence, the *Free State* Court looked to Nichols, *Law of Eminent Domain,* § 26.1315, at 26–169 (3d rev. ed.1976), quoting and discussing the treatise:

> " 'The burden of proving lack of necessity rests upon the person who objects to the proceeding on this ground.' The

same work in § 26.3 in discussing adjudication of the right to condemn states at pages 26–237 to 238 that the condemning authority must prove certain things and then adds 'and, in such jurisdictions as treat the necessity of the use as a judicial question, that the land sought to be taken is necessary for the public use, to the extent, at least, of making out a *prima facie* case.' Maryland is a jurisdiction treating the necessity of use as a judicial question. *See Prince George's Co. v. Beard,* 266 Md. 83, 95, 291 A.2d 636 (1972), and cases there cited."

*Free State,* 279 Md. at 558, 369 A.2d at 1034. The necessity of immediacy is also a judicial question. The City, in the case sub judice, utilizes the first statement—that the burden rests upon the person objecting to the proceeding—without placing it into context with the requirement that the condemning authority must prove certain things relevant to the extent of necessity in order to first make out a *prima facie* case under the statute here controlling.[17]

Additionally, the City argues that "while the decision of an agency as to the public necessity for taking a particular property is subject to judicial review, that review is narrow and limited to determining that the agency's decision is not so oppressive, arbitrary or unreasonable as to suggest bad faith." That argument is, in part, correct. It does not, however, tell the whole story concerning judicial review under the circum-

---

**17.** In *Free State,* as in the case *sub judice,* § 21–16 of the Public Local Laws of Baltimore City was the controlling statute. As discussed *supra,* § 21–16 provides that the court will grant immediate possession of a property pursuant to a quick-take condemnation action if the City files a petition under oath stating the reasons why it is necessary to have *immediate* possession and, if it appears from that petition, "that the public interest requires the City to have *immediate* possession of said property...." § 21–16(a) and (d) (emphasis added). When a statute requires a governmental entity to meet a certain standard, the sufficiency of that entity's compliance with the statute will generally be subject to judicial review, especially when the deprivation of fundamental constitutional rights is involved. Thus, there is a statutory requirement that the City show immediate necessity and it is not sufficient to simply present a conclusory "public use" statement. Even when a statute expressly confirms public use status, it still remains, as we have indicated, ultimately a judicial question.

stances of a § 21–16 quick-take condemnation proceeding, nor for that matter of a regular condemnation. In the present case we are primarily concerned with quick-take actions. The continuing applicability of the City's position on the limitations on the courts in respect to regular condemnation actions, generally, will be left to future cases.

Much of the City's argument is derived from language quoted in *Free State*, that the City has parsed out from the Court's opinion in *Santorios*. The Court in *Santorios* stated:

"When the legislature authorizes a commission or other agency to take and acquire land in fee or as an easement for a public purpose by purchase or condemnation, the selection of the land to be condemned is a matter for the commission to decide. When the taking is challenged, the questions for the court to decide are limited to (i) whether there is any necessity whatever to justify the taking, or (ii) whether the decision of the commission is so oppressive, arbitrary or unreasonable as to suggest bad faith. *State Roads Comm. v. Franklin*, 201 Md. 549, 95 A.2d 99 (1953); *Johnson v. Consolidated Gas, Electric Light & Power Co.*, 187 Md. 454, 50 A.2d 918 (1947); *Murphy v. State Roads Comm.*, 159 Md. 7, 149 A. 566 (1930). In 1 *Nichols on Eminent Domain* (3rd ed.) § 4.11[3], it is said:

'The necessity is for the condemnor and not for the courts to decide, and the decision of such condemnor is final so long as it acts reasonably and in good faith. If the land is of some use to it in carrying out its public object, the degree of necessity is its own affair. Whether there is any necessity whatever to justify the taking is, however, a judicial question.'

Furthermore, it has been said that the necessity for the taking does not have to be absolute: all that is required is that it be reasonable under the circumstances. *Johnson v. Consolidated Gas. Electric Light & Power Co., supra*, at p. 462, 50 A.2d 918 (of 187 Md.)."

*Santorios*, 234 Md. at 345–46, 199 A.2d at 208; *Free State*, 279 Md. at 559, 369 A.2d at 1034–35.

The City also relies on certain language contained in *Schrodel*, a regular condemnation case, where the Court summarized a somewhat limited role in reviewing regular condemnation actions under the second question in *Santorios:*

> " 'Ordinarily the question of whether a proposed [location] is required by public necessity is legislative rather than judicial. . . . [T]he decision . . . as to the public necessity for taking particular property is not subject to judicial review unless [the] decision *is so oppressive, arbitrary or unreasonable as to suggest badfaith.'* (Emphasis added)."

*Schrodel,* 320 Md. at 216, 577 A.2d at 46 (quoting *Murphy v. State Roads Comm'n,* 159 Md. 7, 15, 149 A. 566, 570 (1930)). *See, e.g. Wash. Suburban Sanitary Comm'n v. Utilities, Inc.,* 365 Md. 1, 16, 775 A.2d 1178, 1186 (2001); *Green,* 346 Md. at 79–80, 695 A.2d at 132; *Anne Arundel County v. Burnopp,* 300 Md. 343, 348–49, 478 A.2d 315, 318 (1984); *Bouton v. Potomac Edison Co.,* 282 Md. 142, 151, 383 A.2d 669, 674 (1978); *Free State,* 279 Md. at 558, 369 A.2d at 1034; *Director v. Oliver Beach Imp. Ass'n,* 259 Md. 183, 188–89, 269 A.2d 615 (1970); *Santorios,* 234 Md. at 346, 199 A.2d at 208, *Ligon v. Potomac Elec. Power Co.,* 219 Md. 438, 439, 149 A.2d 376 (1959). In *Schrodel,* the Court did not discuss the first question in *Santorios, i.e.,* whether there was any necessity whatever to justify the taking.

The City also points to *Herzinger v. Mayor and City Council of Baltimore,* another regular condemnation case, where the Court stated:

> "Ordinarily, and for most purposes such as order of proof, it is true that the burden is upon the condemning body to establish its right and power to condemn and the necessity therefor. *Davis v. Board of Education,* 168 Md. 74, 77, 176 A. 878 [(1935)]; *Kenly v. Washington Co. R.R. Co.,* 129 Md. 1, 98 A. 232 [(1916)]. But where the authority is based upon an ordinance or other legislative enactment, it would seem that reliance thereon would make a *prima facie* case and shift the burden to the person attacking it to show that it is arbitrary or unreasonable."

*Herzinger*, 203 Md. 49, 62–63, 98 A.2d 87, 93 (1953). The Court's statement in Herzinger, was prefaced by the use of the word "ordinarily." Nothing in Herzinger obviates the City's responsibility to show a minimal level of immediacy, i.e., a prima facie showing in a quick-take situation.

In the case of regular condemnation, once the City establishes at least a minimal level of public use or purpose, judicial review may be thereafter limited to determining that the agency's decision is not so oppressive, arbitrary or unreasonable as to suggest bad faith; that, however, is not the case in assessing immediacy in a quick-take condemnation action in Baltimore City under § 21–16. Rather, the court must also determine whether there is a necessity to justify an *immediate* taking and, in that determination, must be able to assess the reasons for the immediacy. Section 21–16 expressly *requires the City* to state reasons relating to immediacy, thus the City has the burden not only to present a *prima facie* case of public use, but, additionally, in a quick-take action, the burden to establish the necessity for an immediate taking.

The Court in *Free State* determined that the property in that case, based upon the affidavit attached to the petition for immediate possession, constituted an immediately serious and growing menace to public health, safety and welfare. *Free State,* 279 Md. at 552, 369 A.2d at 1031. In *Free State,* the evidence was sufficient. Therefore, there was necessity for "quick-take," i.e., immediate, condemnation. In *Santorios,* a case apparently based not upon quick-take condemnation, but upon traditional condemnation, the Court stated that "[t]he question of law concerning the necessity for the taking was heard separately . . . and resulted in a dismissal of the petition for condemnation." 234 Md. at 343, 199 A.2d at 207. As such, the question of necessity was not even a direct issue in *Santorios:*

"In the case at bar *[Santorios]*, where the right to condemn was conceded and the public necessity for the extension of the sewerage system was not questioned, there was no evidence to show, nor was it ever contended, that it was not necessary for the Commission to acquire an ease-

ment in at least some part of the property of the landowners in order to construct the extension of the sewer line." 234 Md. at 346, 199 A.2d at 208.

■ In the case *sub judice*, the City did not satisfy the basic statutory mandate of § 21–16(a) of the Public Local Laws of Baltimore City. As stated *supra*, " 'condemnation actions are exclusive special statutory actions for the exercise of the eminent domain power' " and "[t]hus, the statutory scheme delineating [the City's] condemnation authority informs our consideration of the issues before us." *J.L. Matthews*, 368 Md. at 91, 792 A.2d at 300 quoting *Utilities, Inc. of Md. v. Wash. Suburban Sanitary Comm'n*, 362 Md. 37, 49, 763 A.2d 129, 135 (2000); Schwab, *The Maryland Survey: 2001–2002 Recent Decisions: The Court of Appeals of Maryland*, 62 Md. L.Rev. at 845–46. Section 21–16(a) specifically provides that the City must show the necessity for an *immediate* taking. The City's petitions evince a dearth of any specific evidence showing a necessity for the immediate possession of the Property via quick-take condemnation as opposed to a regular condemnation. In the petition for condemnation, the City simply stated that: "This property will be used for redevelopment purposes; namely in the Charles North Project area." The petition for immediate possession and title referenced an attached affidavit which provided only a conclusory and general statement that: "The property . . . must be in possession of the [City] at the earliest time possible *in order to assist in a business expansion in the area.*" [Emphasis added]. The trial court found, based upon these petitions, as well as from the testimony and exhibits introduced at the April 18, 2006, hearing, that the City failed "to demonstrate sufficient grounds which warrant the findings of necessity requisite for the immediate taking" of the Property. We agree with Judge Miller.

The record does not demonstrate sufficient evidence to support a finding that the City is entitled to *immediate* possession of the Property. As stated *supra*, the affidavit attached to the petition for immediate possession and title only

provides that immediate possession is necessary "in order to assist in a business expansion in the area." This statement, in and of itself, while perhaps sufficient to justify regular condemnation, does not justify a quick-take condemnation. *Cf. Free State, supra* (where affidavit showed necessity for public safety). Furthermore, the testimony of the BDC officials at the hearing did not serve to substantiate the City's claim of immediate need. Mr. Dombrowski testified as to what a business expansion in the area meant, stating: "It means to us, at least, the opportunity to provide for additional business expansion opportunities." When asked whether there was a specific plan for the development of the Property, he replied: "Not as yet because the procedure we follow is through a request for proposal procedure as you well know." Mr. Brodie disagreed with Mr. Dombrowski's statements to the effect that there was no specific plan for development of the property. However, when asked about what specific uses were called for in the plan for the Property, he declined to, or could not, provide a specific answer. He replied, "[s]o there are obviously a spectrum of uses that are permitted. That [is] as specific as most urban renewal plans are." Furthermore, he stated that "the specific design for redevelopment will come out of a proposal by a private sector developer."

While the existence of a general urban renewal plan might, under some circumstances, justify the use of regular condemnation, it, alone, under the statute applicable in the instant case, does not suffice to provide the immediacy that needs to exist to justify quick-take condemnation with its lesser procedural due process standards. The vague explanation of "business expansion," subject to non-existent amorphous future proposals, does not justify the City's use of quick-take condemnation. The City needs a more concrete, immediate necessity for an exercise of such power that the "public interest" requires. § 21–16(d). *See e.g., Free State*, 279 Md. at 552, 369 A.2d at 1031 (the Court found that, based upon an affidavit, the property constituted an immediate serious and growing menace to public health, safety and welfare); *Segall v. City of Baltimore*, 273 Md. 647, 648, 331 A.2d 298, 298–99 (1975)

(affidavit showed that all other properties in the development area had been acquired and sale of the entire site could not completed until the subject property had been acquired).[18] *But see Mayor and City Council of Baltimore v. Kelso Corp.,* 281 Md. 514, 518, 380 A.2d 216, 218–19 (1977) (property owner never challenged the City's compliance with the formal requirements of § 21–16 or lack of power to condemn, and therefore had no basis to attack the City's quick-take condemnation action); *Kelso Corp. v. Mayor and City Council of Baltimore,* 45 Md.App. 120, 129, 411 A.2d 691, 696 (1980) (Discussing quick-take proceeding in Baltimore City, the Court of Appeals found that "appellant has failed to show that the City lacked the power or right to condemn its property.").[19]

It is important to note that the opportunities to challenge a condemnation are shortened and truncated when quick-take condemnation is used as opposed to regular condemnation. The court processes available to an owner under the quick-take are severely curtailed, as is well exhibited in the present case. The property owner was ordered out of possession of

---

**18.** The situation in *Segall* is generally understood in land use law to be the "hold-out" factor. During property assemblages, whether private or public, one or more property owners resist selling, wanting to be the last owner of a parcel or among the last, in order to be able to demand higher prices for their property because they are holding up a large project. In private acquisitions a purchaser's options in dealing with hold-outs are limited. In public acquisitions, the condemnation process—even quick-take actions—are available to address the situation. In the present case there was no evidence presented below that Mr. Valsamaki was a "hold-out" or that an immediate taking (as opposed to regular condemnation) was necessary because the failure to *immediately* acquire the property would seriously and immediately impair the City's urban renewal needs.

**19.** It is evident in the case *sub judice,* that in the trial court proceeding, Mr. Valsamaki challenged the right of the City to condemn title to the Property based upon the City's failure to comply with the formal requirements of § 21–16. Mr. Valsamaki argued that the City lacked the right and power to initiate a quick-take condemnation action because it failed to show a public interest which necessitated *immediate* possession of the Property. Rather, the City only asserted the vague reason of "business expansion," not subject to any particularized, detailed, or specific development plan.

his property just six days from the time of the filing of the action and only learned that he was dispossessed when the order was served upon him. Then the time for him to respond was so short that he was not afforded time to conduct—or really to begin—discovery procedures in order to be able to address the issues of public use, necessity, or immediacy. Yet, the City did not at that time have present plans for the utilization of the Property and would only know what was to be done with the Property when private developers submitted proposals to it—which might be in an indeterminant future.[20]

The desire for the general assemblage of properties for urban renewal might be sufficient to justify the use of regular condemnation proceedings, but absent more specific and compelling evidence than was presented here, does not satisfy the immediacy and necessity requirements under quick-take condemnation.[21] As quick-take is used in this instance by the City, it lends itself to the view that quick-take may be used primarily for the purpose of severely limiting the ability of property owners to resist condemnation. Such a use would violate the rights of property owners, fundamental rights that are protected by the Federal and State Constitutions.

The framers of the Federal Bill of Rights did not place the property rights clause in some obscure part of these documents. It was placed in an amendment considered by many to be among the most important sections of that foundation

---

**20.** The transcript, however, does indicate through Mr. Dombrowski's testimony on cross examination that there is the possibility that an RFP would be issued quickly:

"Q I don't understand. If you haven't even started the RFP process, why it's necessary to have immediate possession, why you could [not] go the normal route and just have an ordinary condemnation in say six, nine months, something like that. I'm missing—

A We will have an RFP done in a matter of weeks if we know that we can move ahead on the property."

Even if, *arguendo*, an RFP was issued "in a matter of weeks" there is no way of determining at this time when proposals would be due, how long it would take the BDC to evaluate and the City to approve any proposal, and whether any proposals at all would even be forthcoming.

**21.** With the possible exception of "hold-outs."

stone of our form of democracy. It is found in the Fifth Amendment, included with the double jeopardy clause and the privilege against coerced self-incrimination in criminal cases clause. U.S. Const. amend. V. Immediately alongside those cornerstones of our democracy lies the property rights clause: "No person shall . . . be deprived of life, liberty, or property, *without due process of law;* nor shall private property be taken for public use, without just compensation." U.S. Con st. amend. V (emphasis added). Reverence is due the property rights clause just as is due the other great provisions of the Fifth Amendment. It is a fundamental right.

It is in that context that we closely scrutinize issues relating to the abridgment of property rights and are careful in an appropriate case, not only to consider the use, or "purpose," proposed for the forced governmental acquisition of private property, but also to examine the procedural methods used to deprive an owner of his property. It is our function to determine what process is due in a given case. When, and if, a governmental entity attempts to unnecessarily utilize a form of condemnation that procedurally abridges the right of the property owner to contest the taking of his or her property, it is the function of the court to assure to the property owner that his or her procedural rights are protected. Judge Miller fully recognized what was occurring and with his judgment rectified the abridgment of Mr. Valsamaki's right to full due process under the facts of this case.

Under the circumstances of this case, the *factually unjustified exercise* of quick-take condemnation rather than regular condemnation is an improper procedural abridgment of these rights. Quick-take condemnation should only be conducted when the need for the possession of the property is immediate (i.e., at the time of filing the petition, immediately necessary) and in the public interest. Otherwise, the City should utilize the regular condemnation power which permits a property owner the full exercise of his or her procedural due process rights. Under circumstances where there is no imme-diacy, the use of quick-take condemnation deprives a property

owner of a significant part of the process to which he or she is due, without any corresponding necessity on the part of the City to justify that deprivation. When the stockpiling of property is the goal, except perhaps under some circumstances relating to a final acquisition, the regular condemnation power is more appropriate, in that it affords greater procedural due process protections to the property owner. Nor is the use of quick-take proper purely in order to gain a litigation advantage.

It is useful to understand some other important differences and effects between quick-take condemnation and regular condemnation, especially as they relate to the exercise of eminent domain in respect to the taking of commercial or business properties. In regular condemnation, a taking authority files suit in court to condemn the property and, while the months (or years) long process goes on, the property owner maintains possession of his residence or business, operates it in the case of a business (albeit that the pendency of condemnation proceedings can adversely affect that business, i.e., the ability to obtain financing, the ability to have credit extended to the business, and the like), or resides in it if a residence and, if ultimately, the property owner prevails on h is or her lack of public u se (or purpose) argument, his or her residence or business continues.

When quick-take procedures are used, the taking entity obtains almost immediate possession of the property and in the process the business being conducted on the property, for all intents and purposes, is destroyed. Then, the quick-take process seriously circumscribes the procedural due process available in regular condemnation cases, a process in regular condemnation that contemplates that a property owner have a full opportunity to at least mount an effective challenge to the public nature of the use or purpose behind the taking. Instead of having a full opportunity to challenge the justification of the condemning authority, in quick-take condemnations the property is taken and he or she is left to argue, primarily, only about compensation as the property is already gone. Even if down the road, six months, a year, whatever period of time,

the property owner is able to meet the burden of challenging the intended public use of the property, the business itself is gone. The viable business, that he or she may have spent the better part of a lifetime building up, is gone. In many instances, an owner of a family (or other) business may be unable to simply start-up where he or she was before the condemning authority, via the quick-take process, destroyed the business.

Even when residential properties are taken by quick-take condemnation, it will often be impossible to place the property owner in the pre-condemnation condition if the property owner ultimately were to prevail. By that time the owner's home may have been destroyed. It is impossible to put him or her back in a pre-quick-take position.

In essence, quick-take procedures can be used inappropriately to destroy altogether the right of the property owner to challenge the public use prong of eminent domain which, although greatly circumscribed by various state and federal cases, remains as a viable aspect of the use of eminent domain powers, or otherwise the courts would be writing language out of the constitution by judicial fiat.

██ It is for these and similar reasons that the lower courts should carefully scrutinize the use of this quick-take procedure to ensure that its use, in the first place, is supported by the immediacy,[22] not of the process, but of the alleged public need. General allegations that "we are using it in this case because sometime in the future we want to request proposals from some unnamed and unknown developers, for us to consider, so that we can then convey the property to a developer and it will then construct something that will help 'renew' this property," simply do not suffice. In cases involving this type of condemnation, courts should also seriously consider whether the condemning entity is using this quick-

---

**22.** *The Random House Dictionary of the English Language,* 712 (Unabridged ed.1983) defines immediate as "occurring or accomplished without delay; instant ... following without a lapse of time." One of the synonyms provided is "instantaneous."

take merely to gain a procedural advantage or to stockpile properties that it will later sell to private developers, or simply to freeze the value of the property in a time of a rising economy. These improper, potential considerations dictate that the entity attempting to utilize this process, clearly assert the specific immediacy of the need.

The statute that applies in this case, § 21–16 of the Public Local Laws of Baltimore City, does not merely say that possession of the premises may be immediate, but, just as, if not more, important, given that it involves fundamental constitutional rights of individuals, it limits the use of the particular type of condemnation to cases where the need for the property is immediate. It requires that its use be "necessary" for "immediate possession or immediate title" and requires the City to give "the reasons therefore." § 21–16(a).

At the hearing below, the agents of the City literally refused to answer any questions directed at the immediate need for this specific property, but appeared to have adopted the attitude that the City did not have to have a specific immediate need for the property, so long as sometime in the near or distant future they had such a need. That may (or may not) suffice in regular condemnation proceedings. It is not sufficient when the City chooses to initiate quick-take proceedings. The conferring of quick-take power on Baltimore City (and certain other local governments) was not for the purpose of allowing such entities to use it "whenever they wanted to" but to use it only when immediate possession or title was necessary, and then only when they can establish sufficient reasons for the immediacy of the taking. This extraordinary power conferred upon the City was not granted to it for it to use if it were merely convenient when the need for the use of the property was not immediately necessary.

The purpose of the quick-take power is for it to be used when the need for the public use is immediate. It was not conferred for the purpose of allowing a condemning authority to run "roughshod" over the owners of private property.

When that happens, or begins to happen, the property owner's recourse is to the courts.

### Public Use/Purpose

 Both parties present positions and arguments in respect to the alleged public use of the Property. The City argues that the Circuit Court's reliance on the Supreme Court's decision in *Kelo v. City of New London, Connecticut,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), was misplaced. In support of this argument, the City asserts that Maryland recognizes economic development as a public purpose and thus, the enactment of an urban renewal plan under Ordinance No. 82–799 and Ordinance No. 04–695, in and of itself, establishes the legal authority for the City's acquisition of the Property by quick-take condemnation. While urban renewal certainly may be the basis for a government's taking of private property, a government entity must provide some assurance that the urban renewal will constitute a public use or public purpose for the property taken. It is not enough, especially in quick-take situations, for the City to simply say that it is conducting urban renewal and leave it at that. *See, infra.* The much discussed Supreme Court *Kelo* decision, a case involving the use of the regular condemnation power, not quick-take power,[23] sheds some light on the public use/purpose issue.

### *Kelo v. City of New London*

In 2000, the city of New London, Connecticut approved a development plan for a distressed waterfront area of the city. *Id.* at 471–72, 125 S.Ct. at 2658. The purpose behind the plan was to stimulate economic revitalization. In accomplishing this, the plan was " 'projected to create in excess of 1,000 jobs, to increase tax and other revenues, and to revitalize an economically distressed city, including its downtown and waterfront areas.' " *Id.* (quoting *Kelo v. City of New London,* 268

---

**23.** Thus, Kelo had an opportunity to fully litigate the issues, i.e., she received the process to which she was due.

Conn. 1, 5, 843 A.2d 500, 507 (2004)). In order to implement the plan, the city's development agent began to purchase properties from willing sellers and had proposed "to use the power of eminent domain to acquire the remainder of the property from unwilling owners in exchange for just compensation." *Id.* The resulting primary issue in *Kelo* was "whether the city's proposed disposition of th[e] property qualifie[d] as a 'public use' within the meaning of the Takings Clause of the Fifth Amendment to the Constitution." *Id.*

The city of New London authorized a private non-profit entity, the New London Development Corporation ("NLDC"), to assist the city in its development planning. Various state agencies and the city council evaluated six alternative development proposals for the Fort Trumball area and, after "obtaining state-level approval, the NLDC finalized an integrated development plan. . . ." *Kelo,* 545 U.S. at 473, 125 S.Ct. at 2659. The development plan concerned seven parcels and specifically provided for the composition of each parcel. The parcels would be comprised of (1) a waterfront conference hotel located in a "small urban village" with restaurants, shopping, commercial and recreational marinas; (2) "approximately 80 new residences organized into an urban neighborhood;" (3) "at least 90,000 square feet of research and development office space;" (4A) a 2.4 acre site to be used either to support an adjacent state park or to support the nearby marina; (4B) a renovated marina; and (5, 6, 7) office, retail space, and parking. *Id.* at 473, 125 S.Ct. at 2659. A pedestrian "riverwalk" would run the course of the waterfront along parcels 1 through 4B.

In January 2000, the city council of New London approved the plan and authorized the NLDC, as its development agent, to acquire properties within the development area by purchasing them or exercising eminent domain. The conflict arose when several individuals refused to sell their homes and other property and the NLDC commenced eminent domain proceedings. There was no evidence that the subject properties were "blighted or otherwise in poor condition; rather, they were condemned only because they happened to be located in the

development area." *Kelo,* 545 U.S. at 475–76, 125 S.Ct. at 2660.

As a preliminary matter, Justice Stevens, writing for the Supreme Court, stated two general propositions regarding takings. First, "the City would no doubt be forbidden from taking petitioner's land for the purpose of conferring a private benefit on a particular private party." *Kelo,* 545 U.S. at 477–78, 125 S.Ct. at 2661 (citing *Midkiff,* 467 U.S. at 245, 104 S.Ct. 2321, 81 L.Ed.2d 186; *Missouri Pacific R. Co. v. Nebraska,* 164 U.S. 403, 17 S.Ct. 130, 41 L.Ed. 489 (1896)). Second, "[n]or would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." *Id.* The Court, however, distinguished the situation in *Kelo,* finding that it did not fall under either of the two propositions because "[t]he takings . . . would be executed pursuant to a 'carefully considered' development plan." *Id.* (citing *Kelo,* 268 Conn. at 54, 843 A.2d at 536).

The Court then proceeded to emphasize the requirement that the development plan satisfy a "public purpose," as opposed to a "public use." This is evidenced by the fact that the " 'Court long ago rejected any literal requirement that condemned property be put into use for the general public.' " [24] *Kelo,* 545 U.S. at 478–80, 125 S.Ct. at 2662 (quoting *Midkiff,* 467 U.S. at 244, 104 S.Ct. at 2331). The "broader and more natural interpretation of public use" is a "public purpose." *Id. See e.g., Fallbrook Irrigation Dist. v. Bradley,* 164 U.S. 112, 158–64, 17 S.Ct. 56, 41 L.Ed. 369 (1896). Therefore, the Court found that "[t]he disposition of this case [ ] turns on the question whether the City's development plan serves a 'public purpose.' Without exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this field." *Kelo,* 545 U.S. at 480–81, 125 S.Ct. at 2663.

---

**24.** The substitution of "public purpose" for "public use" has long been a staple of eminent domain law, both in Maryland and in the federal sphere. It is as logical now as it was when it was first conceived. While there will always be a public purpose when property is obtained for actual public use, the contrary is not necessarily so.

The *Kelo* Court looked to two cases, relevant to our evaluation of the case *sub judice,* in discussing situations in which the Supreme Court has found a taking justified by a valid public purpose: *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) and *Midkiff,* 467 U.S. 229, 104 S.Ct. 2321.

In *Berman,* the Court upheld a redevelopment plan for an area of Washington, D.C. That plan targeted blighted residential properties which were beyond repair. The area would be redeveloped with new streets, schools, public facilities, and low-cost housing. The Court found that: "The plan ... specifie[d] the boundaries and allocate[d] the use of the land for various purposes. It ma[de] detailed provisions for types of dwelling units and provide[d] that at least one-third of them [were] to be low rent housing with a maximum rental of $17 per room per month." *Berman,* 348 U.S. at 30–31, 75 S.Ct. at 101.

The owner of a piece of property located within the redevelopment area objected to the condemnation of the property. Though it was undisputed that the property—consisting of a department store—was not blighted, it was nonetheless condemned as part of the plan. There, the property owner argued that taking a person's property "merely to develop a better balanced, more attractive community" was not a public purpose. *Id.* at 31, 75 S.Ct. at 102; *Kelo,* 545 U.S. at 480–81, 125 S.Ct. at 2663. The Court, however, affirmed the taking, stating:

"We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. *See Day–Brite Lighting, Inc. v. State of Missouri,* 342 U.S. 421, 424, 72 S.Ct. 405, 407, 96 L.Ed. 469. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."

*Berman,* 348 U.S. at 33, 75 S.Ct. at 102–03; *Kelo,* 545 U.S. at 480–81, 125 S.Ct. at 2663.

In *Midkiff,* the Court addressed a Hawaii statute designed to combat land oligopoly. The statute provided condemnation authority for transferring fee title of property from lessors to lessees for just compensation. The Court found a valid public use in the elimination of the "social and economic evils of a land oligopoly." *Midkiff,* 467 U.S. at 241–42, 104 S.Ct. at 2330. In deciding that government does not have to actually utilize taken property itself, the Court stated that "it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause." *Id.* at 244, 104 S.Ct. at 2331.

In *Kelo,* the Court deferred to the legislature's judgment, finding that "[t]he City has carefully formulated an economic development plan that it believes will provide appreciable benefits to the community, including-but by no means limited to-new jobs and increased tax revenue." 545 U.S. at 483–84, 125 S.Ct. at 2665. And, that *"[g]iven the comprehensive character of the plan, the thorough deliberation that preceded its adoption,* and the limited scope of our review, it is appropriate for us, as it was in *Berman [infra],* to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the entire plan." *Id.* (emphasis added). Based upon the comprehensive development plan and the Court's prior decisions in *Berman* and *Midkiff* concerning judicial deference towards the legislature, the *Kelo* Court affirmed the city of New London's and NLDC's use of eminent domain via the regular condemnation power. The Court concluded: "In affirming the City's authority to take petitioners' properties, we do not minimize the hardship that condemnations may entail, notwithstanding the payment of just compensation. We emphasize that nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power." [25] *Kelo,* 545 U.S. at 488–90, 125 S.Ct. at 2668 (footnote omitted).

---

**25.** After *Kelo,* there appeared a virtual blizzard of articles, treatises, law review articles, and the like. Most were critical of the opinion, but,

In the case *sub judice,* the necessity for immediate possession (in contrast to the public use or public purpose to be achieved) is not sufficiently shown by the evidence introduced by the City in order to justify the use of quick-take condemnation, as opposed to the regular condemnation power. Notwithstanding that, even had the case involved the use of regular condemnation, the evidence presented below of public use was sparse.[26] The City has only shown that the Property is to be acquired for renewal purposes to assist in a "business expansion" in the area.[27]

---

more importantly, critical of the use of the power of eminent domain for urban renewal or economic development. The list of those articles is extensive and need not be listed in this note. Much of that criticism, can be typified by several comments in an article by Charles E. Cohen, *Eminent Domain after Kelo v. City of New London: An Argument for Banning Economic Development Takings,* 29 Harv. J.L. & Pub. Pol'y 491 (2006).

**26.** Under a regular condemnation proceeding the City may well have introduced additional evidence reflecting a more comprehensive plan. We assume that the City, in a regular condemnation action, would be able to establish the "public use/purpose" of its plan. Though in such actions the City may want to consider offering much more evidence than it did in the present case. This would be beneficial in satisfying its minimal burden of presenting a *prima facie* case as to public use/purpose.

**27.** The Supreme Court addressed the "lack of a reasoned explanation for a taking" in *Cincinnati v. Vester,* 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950 (1930). *Vester* concerned three consolidated Ohio cases which dealt with excess condemnation, "that is, the taking of more land than is needed to be occupied by the improvement directly in contemplation." 281 U.S. at 441, 50 S.Ct. at 360. In *Vester,* the issue was whether the city of Cincinnati could appropriate property in excess of what was needed to widen a street. At the time of appropriation, the city did not have any specific plans for the excess property. Then–Chief Justice Hughes, writing for the Court, opined on the situation:

"We are thus asked to sustain the excess appropriation in these cases upon the bare statements of the resolution and ordinance of the city council, by considering hypothetically every possible, but undefined, use to which the city may put these properties, and by determining that such use will not be repugnant to the rights secured to the property owners by the Fourteenth Amendment. We are thus either to assume that whatever the city, entirely uncontrolled by any specific statement of its purpose, may decide to do with the properties appropriated, will be valid under both the state and Federal Constitutions, or to set up

Mr. Dombrowski testified that there was *no plan* for the development of the Property. Simply put, he stated that such a plan would be forthcoming sometime in the future when the City received a response to a "Request for proposals" (RFP)—should that ever occur. Mr. Brodie disagreed with Mr. Dombrowski's contention that there was no plan for the Property. He testified that "mixed-use development" was as specific as renewal plans generally are in such instances. In addition, however, Mr. Brodie testified that "the specific design for redevelopment will come out of a proposal by a private sector developer." Therefore, the only "plan" for the Property is that a private developer will possibly, at some future time, create a plan that the City might approve. The evidence, or lack thereof, as presented in this case, is not sufficient to demonstrate an immediate public interest necessitating the City's use of quick-take condemnation, under § 21–16 of the Public Local Laws of Baltimore City, to acquire the Property. Nor does it, in our view, fully comport with the holdings of the Supreme Court in *Kelo, Midkiff,* and *Berman.*

The takings in *Kelo* and *Berman* were conducted pursuant to comprehensive development plans that were in place prior to the takings. *Kelo,* 545 U.S. at 473–74, 477, 125 S.Ct. at 2659, 2661 ("The takings before us, however, would be execut-

---

some hypothesis as to use and decide for or against the taking accordingly, although the assumption may be found to be foreign to the actual purpose of the appropriation as ultimately disclosed and the appropriation may thus be sustained or defeated through a misconception of fact."

*Id.* at 446, 50 S.Ct. at 362. The Court held that the takings did not conform to the laws of Ohio.

While the factual and procedural stance of *Vester* is certainly distinguishable from the case *sub judice,* it does lend some weight to our discussion. It is not for the Court to have to guess what use the City may have for a particular piece of property. It is the City's responsibility to plan for economic development before condemnation occurs. This is not to say that the City does not have the flexibility to alter plans as the process moves along, but the City, using the quick-take procedure, cannot just stockpile an assemblage of properties without proving some further justification that those properties need to be taken immediately for a valid public use or purpose. In the case of quick-take condemnation, the City is statutorily required to show that there is an *immediate* necessity for the possession of a particular property.

ed pursuant to a 'carefully considered' development plan."); *Berman,* 348 U.S. at 30–31, 75 S.Ct. at 101 ("The plan ... specifie[d] the boundaries and allocate[d] the use of the land for various purposes. It ma[de] detailed provisions for types of dwelling units and provide[d] that at least one-third of them [were] to be low rent housing with a maximum rental of $17 per room per month."). In fact, the *Kelo* Court found that: "Had the public use in *Berman* been defined more narrowly, it would have been difficult to justify the taking of the plaintiff's nonblighted department store." *Kelo,* 545 U.S. at 484 n. 13, 125 S.Ct. at 2665 n. 13. Furthermore, in both *Kelo* and *Berman,* the developers were bound by contracts to execute the legislatively dictated development plans. *Kelo,* 545 U.S. at 486 n. 15, 125 S.Ct. at 2666 n. 15 ("Notably, as in the instant case, the private developers in *Berman* were required by contract to use the property to carry out the redevelopment plan. See 348 U.S., at 30, 75 S.Ct. 98, 99 L.Ed. 27.").

Under the scheme extant here, private developers are not contractually bound—and may never be, because proposals may never be presented or approved. Additionally, it is impossible for a private property owner to be made aware of the contractual conditions at the time of the quick-take when such contracts do not exist. It is virtually impossible to determine the extent of the public/private dichotomy when no one knows the who, what, and whether of the future use of the property. In the case *sub judice,* the City has not even issued an RFP to acquire proposals for development plans for the subject Property, let alone contractually obligated a developer to develop the Property for a public use in a manner sufficient to satisfy the public purpose requirement. Nor can a property owner challenge the public use aspect of a plan for a property until there is a plan in place for the use of that property.

Finally, both *Berman* and *Midkiff* are distinguishable from the case *sub judice* based upon the condition of the property in the cases prior to condemnation proceedings. As Justice O'Connor wrote in her dissent in *Kelo:* "In both those cases *[Berman* and *Midkiff],* the extraordinary, precondemnation

use of the targeted property inflicted affirmative harm on society-in *Berman* through blight resulting from extreme poverty and in *Midkiff* through oligopoly resulting from extreme wealth." *Kelo*, 545 U.S. at 499–500, 125 S.Ct. at 2674 (O'Connor, J., dissenting).[28]

### Maryland Law

The City argues that Maryland law recognizes economic development as a public purpose and that Ordinance No. 82–799 and Ordinance No. 04–695 implement an urban renewal plan which accomplishes or intends to accomplish such economic development. It is evident that the State recognizes economic development as a public purpose and constitutionally provides the City with authorization to utilize its power of eminent domain in achieving such development. It does not do so, however, without some restraint on the City's eminent domain power.

As discussed *supra*, Article XI–B, § 1 of the Maryland Constitution provides that "[t]he General Assembly of Maryland, by public local law, may authorize and empower the Mayor and City Council of Baltimore: (a) To acquire ... land and property of every kind ... for development or redevelopment...." *Mayor and City Council of Baltimore v. Chertkof,*

---

**28.** The City did not specifically assert that the subject Property is blighted. The only reference to blight is in the City's petition for condemnation, which states: "[The City] is duly authorized to acquire the Property Interest hereinafter described for public purposes by the following Ordinance(s) of the Mayor and City Council of Baltimore, viz: Article 13 § 2–7(h) of the Baltimore City Code (2000 Edition), approved November 11, 1999 and Ordinance No. 04–695, approved June 23, 2004." Simply referencing Article 13, § 2–7(h) of the Baltimore City Code, which provides for the acquisition of deteriorated or abandoned property, is not an affirmative assertion that the specific subject Property constitutes a "serious and growing menace to the public health, safety and welfare." In any case, in terms of the action being a quick-take proceeding, rather than a traditional condemnation proceeding, the City would need to show *immediate* need for any such condemnation. *See Free State*, 279 Md. at 552, 369 A.2d at 1031 (where the affidavit showed that the property " 'constitute[d] a serious and growing menace to the public health, safety and welfare' "). No such showing was made in the case *sub judice.*

293 Md. 32, 42, 441 A.2d 1044, 1050 (1982) ("Our cases have recognized the authority of the City, acting under Art. XI–B . . . to undertake urban renewal projects to renovate slums and to prevent blight and deterioration in urban areas in the public interest."); *Donnelly Adver. Corp. of Maryland v. Mayor and City Council of Baltimore*, 279 Md. 660, 669, 370 A.2d 1127, 1132 (1977); *Free State*, 279 Md. at 554, 369 A.2d at 1032; *Master Royalties Corp. v. City of Baltimore*, 235 Md. 74, 79–82, 200 A.2d 652, 654–56 (1964); *Herzinger v. Mayor and City Council of Baltimore*, 203 Md. 49, 59–61, 98 A.2d 87, 91–92 (1953) ("Redevelopment laws, similar to those in the instant case, have been widely adopted and sustained by the highest courts of many states.").

Furthermore, Article III, § 40A, of the Maryland Constitution provides that the General Assembly may provide quick-take condemnation power to Baltimore City, stating: " . . . where such property is situated in Baltimore City and is desired by this State or by the Mayor and City Council of Baltimore, the General Assembly may provide that such property may be taken immediately upon payment therefor to the owner or owners thereof by the State or by the Mayor and City Council of Baltimore." *Bern–Shaw*, 377 Md. at 281–82 n. 1, 833 A.2d at 504 n. 1; *J.L. Matthews*, 368 Md. at 90, 792 A.2d at 299; *King*, 298 Md. at 86, 467 A.2d at 1035. Section 21–16 of the Public Local Laws of Baltimore City, enacted by the Legislature in furtherance of Article III, § 40A, authorizes and empowers the City with quick-take condemnation authority to achieve such economic development.

 In exercising its quick-take condemnation authority, however, we restate that § 21–16 provides that the City must file a petition under oath stating the reasons why it is necessary to have *immediate* possession and the court must determine "that the public interest requires the City to have *immediate* possession of said property . . . ." § 21–16(a) and (d). This helps to provide justification that a taking is in fact for a public purpose. Then–Chief Judge Murphy, writing for the Court, has stated: "Whether the use for which private

property is taken is public or private is a judicial question, to be determined by the court; a legislative body cannot make a particular use either public or private by merely declaring it so." *Chertkof,* 293 Md. at 43, 441 A.2d at 1051. *See Prince George's County v. Collington Crossroads, Inc.,* 275 Md. 171, 181, 339 A.2d 278, 283 (1975); *Prince George's County v. Beard,* 266 Md. 83, 95, 291 A.2d 636, 642 (1972); *Perellis v. Mayor and City Council of Baltimore,* 190 Md. 86, 93, 57 A.2d 341, 345 (1948).[29]

A judicial determination of public purpose provides a check, no matter how abbreviated, on the Legislature's, and in this case the City's, eminent domain power. This was emphatically expressed well over a century ago in *New Central Coal Co. v. George's Creek Coal & Iron Co.,* 37 Md. 537 (1873):

> "[T]he Legislature has, by virtue of the right or power of eminent domain, the right to authorize, by compulsory process, the taking of private property for public uses, but for public uses only; and it is for the regulation of the exercise of this high and delicate power, and to secure full and ample compensation to the party aggrieved, that the constitutional provision has been adopted. 'It undoubtedly must rest as a general rule,' says Chancellor Kent, (2 Com. 340,) in the wisdom of the Legislature, to determine when public uses require the assumption of private property; but if they should take it for a purpose not of a public nature, as if the Legislature should take the property of A, and give it to B ... under the pretext of some public use or service,

---

**29.** As the Supreme Court of Rhode Island recently noted in *Rhode Island Economic Development Corporation v. The Parking Company, L.P.,* 892 A.2d 87 (2006): " 'If a legislature should say that a certain taking was for a public use, that would not make it so; for such a rule would enable a legislature to conclude the question of constitutionality by its own declaration. The true rule is that the statute will be held to apply only to public purposes, unless it shows the contrary, and the court will then determine whether the particular taking is for a public purpose.' "
892 A.2d at 101 (quoting *In Re Rhode Island Suburban Ry. Co.,* 22 R.I. 455, 456, 48 A. 590, 591 (1901)).

such cases would be gross abuses of their discretion, and fraudulent attacks on private right, and the law would clearly be unconstitutional and void. Whenever, therefore, the use is in fact public, or has for its object the public benefit or utility, though coupled with private objects of gain and emolument, the question of the exercise of the power of eminent domain over private property, is exclusively one of discretion in the Legislature; but *whether the use, in any particular case, be public or private, is a judicial question; for otherwise, the constitutional restraint would be utterly nugatory, and the Legislature could make any use public by simply declaring it so, and hence its will and discretion become supreme, however arbitrarily and tyran[n]ically exercised."*

37 Md. at 560 (emphasis added). Simply resting on the City's assertions in Ordinance No. 82–799 and Ordinance No. 04–695, that the Property will be taken for urban renewal or revitalization purposes is not sufficient to justify the abridgment of a property owner's rights to procedural due process by the use of the extreme power of quick-take condemnation.

In regular condemnations, however, only the public use, not the immediacy of the need, is at issue. In determining whether there is a valid public purpose for a regular condemnation action, we have looked to whether there is a comprehensive development plan. The Court stated in *Master Royalties* that:

"We think that the requirement of a public purpose for the exercise of the power of eminent domain which the Due Process Clause of the Fourteenth Amendment imposes upon the States is no more rigorous than the requirement of public use imposed by the Fifth Amendment upon the Federal Government's exercise of the power of eminent domain. *Berman v. Parker*, 348 U.S. 26 (decided about a year after our *Herzinger* case) *seems to us controlling as showing that a taking in furtherance of a genuine urban renewal plan dealing with problems similar to those exist-*

*ing in the instant case,*[30] is a taking for a public purpose."

*Master Royalties,* 235 Md. at 88, 200 A.2d at 659 (emphasis added). In upholding a development plan for Baltimore City's harbor, the Court in *Marchant v. Mayor and City Council of Baltimore,* 146 Md. 513, 126 A. 884 (1924), stated: "The development of the harbor of Baltimore according to a comprehensive plan, by which the commerce of the port will be most advantageously served, and its future growth encouraged, is a project of distinctively public interest and purpose." 146 Md. at 521, 126 A. at 887 (emphasis added).

In *Beard,* the Court addressed whether a proposed industrial park constituted a public use. 266 Md. 83, 291 A.2d 636. The Court found there to be insufficient evidence concerning the specific uses proposed for the industrial park and remanded the case, stating: "Upon the remand the County will have full opportunity to spell out the use it proposes making of the property and all the details surrounding that use.... *In order for a court to perform its judicial function in this type of case the plan should indeed be comprehensive." Id.* at 96–97, 291 A.2d at 643 (emphasis added).

*Collington Crossroads* concerned the same industrial park as that in Beard, however, by the time the issue reached the Court in that instance, a comprehensive plan had been developed. 275 Md. 171, 339 A.2d 278. The plan was developed to the point where the number of workers, jobs, and additional tax revenue could be predicted: " 'Ultimately, 8,200 workers will probably be located on the Site, providing up to 5,800 new job opportunities for County residents. There will be a real property tax yield at Park completion of nearly $4.8 million annually.' " *Id.* at 177–78, 339 A.2d at 282. Furthermore, Prince George's County would maintain significant control over the project. As the Court stated:

---

**30.** It was testified to that the buildings in *Master Royalties* were "heavily dilapidated and blighted" and that the area targeted for condemnation met the "definition of a slum, blighted or deteriorated area." *Master Royalties,* 235 Md. at 87, 200 A.2d at 659.

"The County will subject land conveyed to private parties to certain 'development covenants.' The comprehensive plan provides that '[t]hese covenants will deal with management of natural features, maintenance of health, safety and welfare, control of hazards and nuisances, and guidelines for assuring a high quality physical environment.' The entire industrial park will be placed in an EIA (Comprehensive Design for Employment and Institutional Areas) zoning classification. As the comprehensive plan states, the classification 'will offer Prince George's County the opportunity to control the detailed development of this 1700 acre area through the use of a three phase process of review and approval of detailed plans.'"

*Id.* at 180, 339 A.2d at 283.

All of these instances reflect greater specificity and planning than was presented as evidence below in the case *sub judice.*[31] Thus, while economic development may be a public purpose, it must be carried out pursuant to a comprehensive plan. In a specific case, simply providing that a property is to be condemned "for urban renewal purposes," without more, is not enough. This is particularly true where quick-take condemnation proceedings are concerned, as shown by our discussion *supra.*

## III. Conclusion

For the aforementioned reasons, we hold that, pursuant to § 21–16 of the Public Local Laws of Baltimore City, the City failed to provide sufficient reasons for its *immediate* possession of and title to the subject Property. § 21–16(a). Without evidence that the continuing existence of a particular building or property is immediately injurious to the health and safety of the public, or is otherwise immediately needed for public use, there is no way to justify the need for *immediate* possession of the Property via quick-take condemnation pro-

---

**31.** As we have indicated, *supra,* in a regular condemnation action and trial, the City may well be able to produce sufficient evidence of public use or purpose. It, as we have stated, has done so in the past.

ceedings. § 21–16(d). This is as opposed to offering a property owner the full process to which he or she is constitutionally due, via the exercise of the regular condemnation power. Therefore, we affirm the Circuit Court's denial of the City's petition for condemnation and petition for immediate possession and title.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

RAKER and HARRELL, JJ., join in the judgment only.

Judge RAKER and Judge HARRELL authorize me to state that they join in the analysis and conclusion regarding immediacy in this opinion and, therefore join the judgment; however, they do not join the analysis or conclusion regarding public purpose.